**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Pasquale MATASSINI, a/k/a Pat Matassini, and Robert E. Rodriguez,**
**Defendants-Appellees.**

**No. 76–3631.**

United States Court of Appeals,
Fifth Circuit.

Jan. 10, 1978.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Eleanore J. Hill, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellant.

Harry Hobbs, Tampa, Fla., for Rodriguez.

Nicholas M. Matassini, Tampa, Fla., for Matassini.

Before GOLDBERG and MORGAN, Circuit Judges, and WYZANSKI *, District Judge.

GOLDBERG, Circuit Judge:

On September 26, 1950 defendant-appellee Pasquale Matassini was convicted in the Criminal Court of Record of Hillsborough County, Florida of the offense of breaking and entering. He was sentenced to serve three years in the state prison. On June 22, 1955 the governor and cabinet of Florida pursuant to their authority under the state constitution granted Matassini "a full and complete pardon of the above offense, thereby restoring to him full and complete civil rights." Twenty-one years later, on May 12, 1976, Matassini was indicted by a federal grand jury for receipt, 18 U.S.C. § 922(h)(1),[1] and for possession, 18 U.S.C. App. § 1202(a)(1),[2] of a firearm by a convicted felon. Defendant-appellee Robert E. Rodriguez was charged in the same indictment with aiding and abetting Matassini in the receipt offense in violation of 18 U.S.C. §§ 2(a) and 922(h). In his pre-trial motion to dismiss the indictment and now on appeal, Matassini contends that his "full and complete pardon" established an absolute defense to the offenses charged. The government does not dispute that the pardon was granted but contends that the pardon is insufficient as a matter of law to remove Matassini from the proscription of §§ 922(h)(1) and 1202(a)(1). In particular, the government argues that the pardon does not remove Matassini from the class of convicted felons reached by these provisions, that the exclusive avenues of relief from those proscriptions are those provided by the statute, 18 U.S.C. §§ 925(c)[3] and

---

* Senior District Judge of the District of Massachusetts, sitting by designation.

1. § 922(h) It shall be unlawful for any person—
   (1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
   (2) who is a fugitive from justice;
   (3) who is an unlawful user of or addicted to marihuana or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954); or
   (4) who has been adjudicated as a mental defective or who has been committed to any mental institution;
   to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

2. § 1202 **Receipt, possession, or transportation of firearms—Persons liable; penalties for violations**

(a) Any person who—
   (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or
   (2) has been discharged from the Armed Forces under dishonorable conditions, or
   (3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or
   (4) having been a citizen of the United States has renounced his citizenship, or
   (5) being an alien is illegally or unlawfully in the United States, and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

3. § 925 (c) A person who has been convicted of a crime punishable by imprisonment for a

1203(2),[4] and that Matassini fails to come within the purview of those exemptions. In an order dated August 18, 1976, the District Court for the Middle District of Florida, Tampa Division, dismissed the indictment as to both defendants. The government appeals, pursuant to 18 U.S.C. § 3731. We affirm the district court's dismissal of the indictment and hold that "full and complete" Florida pardons granted prior to the enactment of the Omnibus Crime Control and Safe Streets Act of 1968 exempt recipients from criminal liability under §§ 922(h) and 1202(a). As defendant Rodriguez is charged only with aiding and abetting, the dismissal as to Matassini necessarily disposes of the indictment as to Rodriguez.

## I.

It is necessary initially to unravel, at least in part, the web of statutory prohibitions and exemptions regulating the receipt and possession of firearms. The provisions under which Matassini was indicted were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 82 Stat. 197 (hereinafter referred to as the "Omnibus Act"), as amended by the Gun Control Act of 1968, Pub.L. 90–618, 82 Stat. 1213. The Omnibus Act, hurriedly considered and passed by Congress in the wake of the tragic assassinations of Martin Luther King, Jr. and Robert F. Kennedy, contained two titles addressing the problem

of control of firearms. Title IV, entitled "State Firearms Control Assistance," primarily concerned federal licensure of "persons engaging in the businesses of importing, manufacturing, or dealing" in firearms and was the subject of consideration by a Senate committee. Section 922, comprising a lengthy set of regulations governing activity by importers, manufacturers, and dealers, is found in this title. Title VII, entitled "Unlawful Possession or Receipt of Firearms," was added as a floor amendment and enacted without committee consideration. Its operative provision, § 1202, was specifically addressed to the receipt, possession, or transportation in commerce of firearms by persons deemed to present special dangers to public safety. Both § 922 and § 1202 contain language proscribing the receipt of firearms by convicted felons; § 1202 reaches possession as well. Title VII contains a provision, § 1203(2), exempting convicted felons who have received pardons meeting specified conditions from criminal liability under § 1202. Title IV contains no parallel provision respecting pardons, but does provide for administrative relief from certain disabilities in § 925(c).

Defendant Matassini has abandoned any claim that the application of §§ 922 and 1202 to him raises issues of constitutional dimension. The issue before us, then, is one of statutory construction; we must decide

term exceeding one year (other than a crime involving the use of a firearm or other weapon or a violation of this chapter or of the National Firearms Act) may make application to the Secretary for relief from the disabilities imposed by Federal laws with respect to the acquisition, receipt, transfer, shipment, or possession of firearms and incurred by reason of such conviction, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector conducting operations under this chapter, who makes application for relief from the disabilities incurred under this chapter by reason of such a conviction, shall not be barred by such conviction from further

operations under his license pending final action on an application for relief filed pursuant to this section. Whenever the Secretary grants relief to any person pursuant to this section he shall promptly publish in the Federal Register notice of such action, together with the reasons therefor.

4. § 1203   **Exemptions**
This title shall not apply to—
(1) any prisoner who by reason of duties connected with law enforcement has expressly been entrusted with a firearm by competent authority of the prison; and
(2) any person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm.

whether these provisions of the Omnibus Act are properly construed to proscribe the receipt or possession of a firearm by a convicted felon who had received a full and complete pardon under state law prior to the enactment of the Omnibus Act.[5]

## II.

■ We begin with an analysis of Title VII, for it is in this title that Congress spoke most directly to the effect of a state pardon on criminal liability.

5. We believe it appropriate to state at the outset that the issue is neither whether Congress has the power to utilize prior state convictions to identify potentially dangerous persons, nor whether Congress can constitutionally attribute to a state pardon an effect with respect to federal disabilities different from that which the state chooses to accord its own pardon. We note that the Supreme Court has never been squarely confronted with the issue of the effect of a state pardon on federal disabilities. In a converse case, *Carlesi v. New York*, 233 U.S. 51, 34 S.Ct. 576, 58 L.Ed. 843 (1914), the Court considered constitutional limitations on a state's use, for purposes of its habitual offender statute, of an offender's federal conviction which had been Presidentially pardoned. In that case, the New York appellate courts had determined "that the [state] statute directed the consideration of the prior conviction despite the pardon," 233 U.S. at 56, 34 S.Ct. at 577, thus precluding an alternative statutory construction and leaving only the constitutional issue for the Supreme Court. The Court saw the issue before it as "a narrow one," involving

> not the determination of the operation and effect of a pardon within the jurisdiction of the sovereignty granting it, but simply requir[ing] it to be decided how far a pardon granted as to an offense committed against the United States operates, so to speak, extraterritorially as a limitation upon the states, excluding them from considering the conviction of a prior and pardoned offense against the United States in a prosecution for a subsequent state offense.

*Id.* at 57, 34 S.Ct. at 577. The Court was careful to note that if any action taken by a state in considering a prior offense which had been pardoned "was in any just sense a punishment for such prior crime," then that act "would be void because destroying or circumscribing the effect of the pardon granted under the Constitution and laws of the United States," *id.*

Once the issue was thus framed, the *Carlesi* Court found its solution "free from difficulty" and simply reaffirmed its decision in *McDonald v. Massachusetts*, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 (1901), upholding a state habitual

The proscription of § 1202(a)(1)[6] extends to "[a]ny person who . . . has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony . . . ." The statute defines "felony" as

> any offense punishable by imprisonment for a term exceeding one year, but does not include any offense (other than one involving a firearm or explosive) classified as a misdemeanor under the laws of a State and punishable by a term of imprisonment of two years or less,

offender law against an ex post facto attack. The *McDonald* Court had held that the application of a habitual offender law does not impose an additional punishment on crimes for which an offender has already been convicted; rather, "[t]he punishment is for the new crime only, but is the heavier if he is an habitual criminal," 180 U.S. at 312, 21 S.Ct. at 390.

Thus, crucial for the Court in *Carlesi* was the fact that the pardoned conviction was merely a circumstance of aggravation; its use was "not in any degree a punishment for the prior crime," 233 U.S. at 57, 34 S.Ct. at 577. The Court's statement that

> we must not be understood as in the slightest degree intimating that a pardon would operate to limit the power of the United States in punishing crimes against its authority to provide for taking into consideration past offenses committed by the accused . . . even although for such past offenses there had been a pardon granted

was explicitly limited to consideration of a pardoned offense "as a circumstance of aggravation." *Id.* at 59, 34 S.Ct. at 578. In this respect, the gun control legislation in the case at bar is quite different from a habitual offender provision; here, receipt or possession of a firearm would not constitute a crime but for the existence of a prior conviction. The prior conviction is a substantive element of the crime rather than a circumstance of aggravation. Thus, there is an argument under *Carlesi* that using a pardoned conviction as a predicate for prosecution would result in impermissible additional punishment for the pardoned offense. A counter-argument might view a restriction on the right to possess firearms as a permissible regulatory measure rather than as an impermissible punishment. In any event, we do not believe that *Carlesi* is dispositive of the case before us. *See generally* Note, "Prior Convictions and the Gun Control Act of 1968," 76 Columbia L.Rev. 326, 339–42 (1976).

6. *See* note 2 *supra* for a full citation of the statutory provision.

§ 1202(c)(2). The statute also contains an explicit exemption, in § 1203(2), from the operation of § 1202(a) for

> any person who has been pardoned by . . . the chief executive of a State and has expressly been authorized . . to receive, possess, or transport in commerce a firearm.

The statute does not provide us with a glossary to determine when a particular pardon "expressly" authorizes the receipt, possession, or transport of a firearm. With respect to pardons granted after the enactment of the Omnibus Act and in contemplation of its terms, such a glossary would not seem necessary; state pardoning authorities may simply adopt the language of the federal provision more or less *in haec verba*. But with respect to pardons granted prior to the enactment of the Omnibus Act, the meaning of express authorization is considerably more problematic. Our examination of the statutory language and legislative history[7] of Title VII does not suggest any determinative congressional intent or provide any universal resolution as to the effect of pre-enactment pardons. Accordingly, our analysis and conclusions focus rather closely on the terms and legal setting of Matassini's 1955 pardon.

At the time of Matassini's pardon, Title VII had not been enacted and no provision of federal law addressed the effect of a state pardon on the lawfulness of receipt or

7. The legislative history of Title VII is, to say the least, rather sparse and ambiguous, and is hardly decisive in divining congressional intent on the narrow issue before us. Indeed, the Supreme Court, in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), a case considering the interstate nexus required for conviction under § 1202, noted that the entire Title VII "was a last minute Senate amendment . . . hastily passed, with little discussion, no hearings, and no report," 404 U.S. at 344, 92 S.Ct. at 520, and concluded that "the legislative history of [the] Act hardly speaks with that clarity of purpose which Congress supposedly furnishes courts in order to enable them to enforce its true will," *id.* at 346, 92 S.Ct. at 522, *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 483, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Furthermore, the Court observed, "the various remarks by legislators 'are sufficiently ambiguous, insofar as this narrow issue is concerned . . . to invite mutually destructive dialectic,' and not much more," *id., quoting FCC v. Columbia Broadcasting System*, 311 U.S. 132, 136, 61 S.Ct. 152, 85 L.Ed. 87 (1940).

The complete legislative history of Title VII is reproduced as an Appendix to *Stevens v. United States*, 440 F.2d 144, 152–66 (6th Cir. 1971). Our own review of that history convinces us that the Supreme Court's observations in *Bass* are equally applicable to the narrow issue before us, the effect of a pardon granted prior to the effective date of the federal legislation on federally created disabilities. The government contends that the determinative passage is a colloquy between Senator Long, the sponsor of the amendment, and Senator McClellan during the floor debate:

Sen. McClellan:

> The thought that occurred to me, as the Senator explained it, is that if a man had been in the penitentiary, had been a felon, and had been pardoned, without any condition in his

pardon to which the able Senator referred, granting him the right to bear arms, could that man own a shotgun for the purpose of hunting?

440 F.2d at 163. Senator Long responded in the negative. *Id.*

As we read this interchange, we cannot be certain that either or both Senators here specifically directed attention to the time at which the pardon was granted. When this issue did arise later in the colloquy, Senator Long stated:

> there is absolutely no doubt in my mind that, applied purely prospectively to people who are convicted of crimes in the future, the amendment could not be subject to any challenge whatever. It is likely that one might argue that by applying this amendment to people who have been convicted of crimes prior to this date and pardoned by the pardoning authority, their rights might be violated. That is something that can be studied in conference.

440 F.2d at 164. Even here, Senator Long might have been addressing the situation of felons convicted prior to the enactment date but pardoned after that date. *See* the discussion of *Carlesi v. New York* at note 5 *supra*.

No conference was held on Title VII and we have found no further legislative history bearing directly on this question. We cannot be certain from these passages even of Senator Long's intention as to how the provision would apply to prior-pardoned felons. As to the intent of other members of Congress, we believe the words of the Supreme Court with respect to another aspect of Title VII are also apposite here:

> But even if Senator Long's remarks were crystal clear to us, they were apparently not crystal clear to his congressional colleagues.

*Bass, supra,* 404 U.S. at 346, 92 S.Ct. at 521.

possession of firearms. Obviously, no federally-approved "express terms" were available to the Florida pardoning authorities for inclusion in Matassini's pardon. But as we shall discuss, the state pardon granted to Matassini did contemplate the removal of virtually all collateral disabilities flowing from Matassini's 1950 conviction. In particular, the pardon both contemplated and had the effect, under state law, of restoring to Matassini the right to receive and possess firearms. We must determine whether this pardon is sufficiently "express" to bring Matassini within the § 1203(2) exemption. We do so in light of the effect that the pardon was intended to have under Florida law, the language and legislative history of Title VII, and the applicable canons of statutory construction. We come to the following conclusions:

(1) That Matassini's Florida pardon was premised on an assessment of Matassini as an individual and was intended to restore to him full and complete civil rights, specifically including the right to receive and possess a firearm;

(2) That Congress, in requiring express authorization for convicted felons to receive and possess firearms, intended that pardoning authorities consider the effect on public safety of permitting any given pardonee to receive and possess firearms;

(3) That where this legislative purpose is satisfied, Congress did not intend the absurd requirement that talismanic words be employed prior to the time those words were specified; and

(4) That the 1955 pardon granted to Matassini satisfied the federal legislative purpose, came as close to "express authorization" as was reasonably possible under the circumstances, and thus satisfied the requirements of § 1203(2).

A.

The language of § 1203(2) provides an unmistakable indication of one fact: that Congress believed the federal interests underlying Title VII could and would be adequately safeguarded by actions of state governors. Congress placed trust in governors to determine, in the exercise of their pardoning powers, whether the collateral

consequence that a pardonee be permitted to receive and possess a firearm should follow from any given grant of pardon. A central inquiry for us, therefore, is whether Governor Collins and the Florida Pardon Board considered this issue and intended, in granting Matassini his 1955 pardon under Florida law, to permit him to receive and possess a firearm.

We begin by noting that the 1968 Florida Constitution, Art. IV, § 8(a) confers power on the governor, with the approval of three members of the cabinet, to "grant full or conditional pardons" and to "restore civil rights;" *compare* Art. IV, § 12 of the 1885 Constitution which conferred similar power on a Pardon Board composed of the governor and four members of the cabinet. The Florida courts have held that

[U]nder a constitutional provision like this, the pardoning power may, in granting a pardon after conviction, impose any condition, limitation, or restriction that is not illegal, immoral, or impossible of performance, and that the acceptance of the pardon binds the person accepting it to all such conditions, limitations, and restrictions contained therein that are legal, moral, and possible of performance. [Citations omitted.]

*State v. Horne,* 52 Fla. 125, 42 So. 388, 392 (1906), *reaffirmed and applied in State ex rel. Bailey v. Mayo,* 65 So.2d 721 (Fla.1953).

There can be no doubt that the pardoning authorities might have chosen to grant defendant Matassini a conditional pardon in 1955, nor that the "full and complete pardon" actually granted represented the exercise of the full pardoning power available under Florida law. The effect of such a pardon has been carefully and consistently delineated by the Florida courts over the past century. In an 1872 Advisory Opinion to the Governor, Opinion of Justices, 14 Fla. 318, 319 (1872), the Florida Supreme Court adopted, for state purposes, the expansive language of the United States Supreme Court in the celebrated case of *Ex Parte Garland,* 4 Wall. (71 U.S.) 333, 380, 18 L.Ed. 366 (1867), to the effect that a pardon

reaches both the punishment prescribed for the offense, and the guilt of the of-

fender. When the pardon is full, it remits the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense.

This language was reaffirmed in *Singleton v. State,* 38 Fla. 297, 21 So. 21 (1896), which went on to declare

It is settled law that the pardon of an offense not only blots out the crime committed, but removes all disabilities resulting from the conviction . . . [and] "gives to the person in whose favor it is granted a new character, and makes of him a new man."

21 So. at 22, *quoting State v. Baptiste,* 26 La.Ann. 134. *Singleton* was recently reaffirmed in *In re Advisory Opinion of Governor Civil Rights,* 306 So.2d 520, 523 (Fla. 1975).

Despite the scholarly criticism to which this expansive concept of the effect of a

pardon had been subjected,[8] the Supreme Court of Florida held firm to its approach in *Marsh v. Garwood,* 65 So.2d 15, 19 (Fla. 1953) (en banc), stating (in *dicta*) that a pardon

reaches both the punishment prescribed and the guilt of the offender. . . . [W]hen granted after [the convict's] time of imprisonment has expired, it [re]moves all that is left of the consequences of conviction—his disabilities, and restores him to his customary civil rights, which are generally recognized as the right to hold office, to vote, to render jury service, and to be a witness.

The *Marsh* case provided the most recent judicial statement of Florida law at the time Matassini's pardon was granted. Subsequent development of Florida law, both statutory and judicial, has further reinforced this broad reading of the effect of a pardon.[9]

---

**8.** *See, e. g.,* Williston, "Does a Pardon Blot Out Guilt?" 28 Harvard L.Rev. 647 (1915).

**9.** In *Fields v. State,* 85 So.2d 609, 611 (Fla. 1956), the court squarely held

that a felony conviction for which the offender has received a full and unconditional pardon cannot be counted as a prior felony conviction under the provisions of our habitual offender laws.

The *Fields* court, in reaching this conclusion, noted contrary authority to the effect that habitual offender laws "are not regarded as imposing any additional penalty for the former conviction, so as to collide with the rule against double jeopardy or ex post facto laws," but cited *Marsh* and *Singleton* in concluding that "to permit proof of a conviction under such circumstances, without regard to a pardon granted the offender therefor, violates the rule of penal law repeatedly expressed in opinions of this Court that a full and unconditional pardon 'removes all that is left of consequences of conviction,'" 85 So.2d at 610. The court was careful to note, however, that its opinion did not preclude the legislature from making pardoned convictions the basis for punishment under habitual offender statutes. Rather, the court stated

that inasmuch as the Legislature did not expressly include pardoned convictions in the Act, it is taken as evidencing an intention on the part of the Legislature of this State that pardoned convictions not be counted as prior "live" felony convictions.

*Id.* at 611. It is worth nothing that the statute construed in *Fields* defined a convicted felon, using terms virtually identical to those em-

ployed in Titles IV and VII of the Federal Omnibus Act, as

[a] person who [has] been convicted within this state of a felony or an attempt to commit a felony, or under the laws of any other state, government, or country, of a crime which, if committed within this state, would be a felony . . . .

Fla.Stat.Ann. § 775.09, repealed by Fla.Laws 1971, c. 71–136, § 6, effective January 1, 1972.

The principle stated in *Fields,* that a pardoned offense does not constitute a prior "live" conviction, is firmly embedded in Florida's statutory as well as decisional law. Florida's current habitual offender provision, enacted after the decision in *Fields,* explicitly excludes from its operation individuals who have "received a pardon for any felony or other qualified offense," Fla.Stat.Ann. § 775.084. A second statute, Fla.Stat.Ann. § 775.13, which requires persons convicted of a felony to register with the county sheriff upon entering any county in the state, exempts, among others, "any person who [h]as received a full pardon for the offense for which convicted," § 775.13(5)(b). Florida's continuing dedication to the full rehabilitation and restoration to the community of pardoned offenders is most recently manifested by the new Florida Evidence Code, Fla.Laws 1976, c. 76–237, approved June 23, 1976 and effective July 1, 1977, § 90.610(1)(b) of which provides:

Evidence of a prior conviction, which evidence would be otherwise admissible, is inadmissible if the witness has been the subject of a pardon.

With respect to the precise question here at issue, possession of firearms by convicted felons, the Florida Legislature has spoken with considerable specificity. Fla.Stat.Ann. § 790.23(1) proscribes possession of firearms by "any person who has been convicted of a felony." Subsection (2) of that provision states explicitly that "[t]his section shall not apply to a person convicted of a felony whose civil rights have been restored." [10] What makes Florida's felon-in-possession statute particularly significant as it applies to the defendant in this case is the fact that the statute dates almost precisely to the time of Matassini's pardon. The act, including the original text of subsection (2),[11] was approved by the governor of Florida on June 2, 1955; 1955 Fla.Laws, c. 29766. Only three weeks later, on June 22, 1955, the governor, with the concurrence of three members of the Florida cabinet, granted Matassini "a full and complete pardon . . . thereby restoring to him full and complete civil rights."

This recitation of Florida statutory and decisional law leads inexorably to several conclusions. At the time Matassini's pardon was granted and subsequently, the effect of that pardon was to erase, for all purposes under Florida law save possibly occupational qualification and licensing,[12]

---

**10.** Section § 790.23 was examined by the Florida Supreme Court in *Nelson v. State,* 195 So.2d 853 (Fla.1967). The court analogized the purpose of the statute to that of the Federal Firearms Act (upheld in *Cases v. United States,* 131 F.2d 916 (1st Cir. 1942), *cert. denied,* 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943)), namely, protecting "the public by preventing the possession of firearms by persons convicted of certain crimes or who are fugitives from justice," 195 So.2d at 855. The court distinguished an Ohio case, *City of Akron v. Williams,* 172 N.E.2d 28 (Ohio Mun.1960), and specifically noted that the ordinance struck down in the Ohio case "prohibited the possession of pistols by all convicted felons, whether or not civil rights had been restored," 195 So.2d at 855, thus suggesting that the validity of the Florida statute might be tied to its exemption provision. The Florida court's penultimate statement precisely delineated the scope of its own holding:

The statutory prohibition of possession of a pistol by one convicted of a felony, civil rights not restored, is a reasonable public safeguard.

*Id.,* at 855–856.

Subsequent cases, while invalidating as unconstitutionally vague another provision of § 790.23, have specifically upheld the exemption of persons whose civil rights have been restored as "clear and unambiguous," *Driver v. Van Cott,* 257 So.2d 541, 543 (Fla.1971); *Crossley v. State,* 334 So.2d 17, 19 (Fla.1976). The constitutionality of this section has also been upheld by this court in *Ransom v. Wainwright,* 553 F.2d 900 (5th Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 206, 54 L.Ed.2d 145 (1977).

The significance of the required underlying conviction and the reach of the exemption provision have also been examined by the courts. In *State v. Davis,* 203 So.2d 160 (Fla.1967), the Florida Supreme Court stated that the felon-in-possession offense

cannot be committed unless the individual charged is an ex-felon. His prior conviction is a substantive element of the crime

charged. Its relevancy is not restricted solely to a determination of the extent of sentence to be served as it would be in a true recidivist proceeding.

*Id.* at 162. *Compare Davis* with *Carlesi v. New York,* discussed at note 5 *supra.*

In *Hernandez v. State,* 289 So.2d 16 (Fla. App., 3rd Dist. 1974), the court affirmed a conviction in a case in which defendant's application for a pardon had been denied and no documentary evidence of a restoration of civil rights was produced. Implicit in the proceedings was the understanding that had a pardon been granted for the underlying offense, the felon-in-possession conviction could not have stood.

**11.** This act shall not apply to a person having been convicted of a felony whose civil rights have been restored.

**12.** The Florida courts, like those of other states, at one time recognized licensing of the professions as a limitation on the effect of a pardon. In *Page v. Watson,* 140 Fla. 536, 192 So. 205 (1938), the court held that a pardon granted to a medical doctor was not a complete defense to proceedings filed before the Board of Medical Examiners. The court stressed the action of the Florida Legislature, pursuant to the police power, requiring a showing of "honor and moral character" as a condition to the right to practice medicine in Florida, 192 So. at 208, and quoted language from *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898),

that such legislation is not to be regarded as a mere imposition of additional penalty, but as prescribing the qualifications for the duties to be discharged and the position to be filled,

192 So. at 210. On petition for rehearing, *id.* at 211, the court found no evidence of legislative intent "to eliminate entirely the absence of good moral character as a ground for revoking a license to practice medicine" and concluded that

the collateral disabilities flowing from Matassini's earlier felony conviction. We believe the governor and cabinet of Florida may be presumed to have considered the implications of granting Matassini a full pardon rather than some more limited or conditional degree of forgiveness. In particular, the pardoning authorities might have limited Matassini's right to possess a firearm. Instead, acting against the background of a legislative determination (in which the governor had personally concurred three weeks previously) that pardoned individuals, unlike other convicted felons, could be permitted to possess firearms, and a recent judicial determination that a pardon removes all that is left of the consequences of conviction, Governor Collins and three members of the cabinet chose to grant "a full and complete pardon."[13]

The pardoning authorities made specific findings that Matassini was worthy of a full pardon; his certificate of pardon states that applicant was granted a parole . . . . ; that several reputable citizens of Hillsborough County recommend a full pardon be granted at this time; and that the Florida Parole Commission states his adjustment on parole has been excellent and that he is entitled thereby to restoration of his civil rights.

Nothing in the record before us suggests that had the governor and cabinet had the opportunity to address in specific terms the national concerns underlying subsequently enacted federal gun control legislation, they would have hesitated to grant Matassini a full and complete pardon.[14]

We have carefully examined the conditions under which Matassini was pardoned

the felonies of which petitioner was convicted involved moral turpitude and affect his character and qualities as a practitioner of medicine, even though his rights of citizenship have been restored by a full pardon. *See State v. Snyder,* 136 Fla. 875, 187 So. 381 (1939); *cf. Henderson v. State,* 55 Fla. 36, 46 So. 151 (1908). The court explicitly considered these precedents in *Fields, supra,* and found them not to be controlling in a criminal case "in which the fact of a prior conviction is given an absolute and conclusive effect in determining the sentence to be imposed upon one thus characterized as an 'habitual' offender." 85 So.2d at 610.

The Florida Legislature has recently addressed some of these issues. Fla.Stat.Ann. § 112.011(1)(b) provides that "[a] person whose civil rights have been restored shall not be disqualified to practice, pursue or engage in any occupation, trade, vocation, profession, or business for which a license, permit, or certificate is required to be issued by the state . . . solely because of prior conviction for a crime", unless the crime was "directly related" to the specific occupation or employment position for which the license is sought. In a series of recent decisions, the Florida Supreme Court, in its supervisory capacity over admission to the state bar, has held that a full pardon and restoration of civil rights permits a prior felon to be considered for admission to the Florida Bar while a conditional pardon does not. *In re Florida Board of Bar Examiners,* 183 So.2d 688, 690 (Fla.1966); *In re Florida Board of Bar Examiners,* 341 So.2d 503 (Fla.1976).

**13.** We need not be puzzled by the underlying rationale for such a decision; implicit in the lengthy and consistent development of Florida law, in all three branches, is a steadfast belief

in the possibility and desirability of rehabilitation of former offenders. The ideal was perhaps best stated in its early judicial formulation:

to rehabilitate a former offender, return him to normal life in society and "[make] of him a new man."

*Singleton, supra,* 21 So. at 22.

**14.** In *United States v. Sutton,* 521 F.2d 1385 (7th Cir. 1975), the Seventh Circuit found that certain national concerns "apply equally whether the pardon in question was granted before or after the statute's enactment," *id.* at 1390, and held that a pre-1968 "certificate of restoration" which "understandably contain[ed] no such express authorization [to possess firearms]," *id.* at 1389, failed to comply with the requirements of § 1203(2). The *Sutton* court expressed support for the government's argument that the certificate of restoration at issue "was designed to provide only a limited and semi-automatic return of statutorily denied rights of citizenship . . . as opposed to a full pardon." *Id.* at 1388. Nevertheless, the court purported to treat the certificate as a full pardon. To the extent the *Sutton* holding would extend to the full and complete Florida pardon here at issue, we decline to follow it.

We have also considered the decision of the district court in *United States v. Castellana,* 433 F.Supp. 1309 (M.D.Fla.1977). Without passing on the merits of that case, we note that it, like other cases relied on by the government, concerned a pardon granted subsequent to the enactment of the Omnibus Act. We do not view such cases as determinative of the issues before us.

and returned to normal society as a citizen with all his civil rights restored. Under Florida law, Matassini clearly had the right to possess a firearm. Yet twenty-one years later, Matassini was indicted for receipt and possession of a firearm—which receipt and possession would have been perfectly legal for most of Matassini's fellow citizens with full civil rights. With these facts in mind, we now consider whether Matassini is, within the intendment of the Congress, properly regarded as subject to the proscription of § 1202(a)(1).

### B.

As we have noted,[15] neither the statutory language nor the legislative history of Title VII presents any clear indication of the intent of Congress with respect to the narrow issue before us. Nevertheless, it is our duty to construe the statutory provision and apply it to Matassini. We are guided in this task by the repeated injunctions of the Supreme Court with respect to the construction of criminal statutes. In order to implement the congressional directive that cannons be taken off the street, we must wheel these canons of construction into the judicial chambers. While a criminal statute is "not to be construed so strictly as to defeat the obvious intention of the legislature," *Barrett v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976), *quoting American Fur Co. v. United States,* 2 Pet. (27 U.S.) 348, 367, 7 L.Ed. 450 (1829), the Supreme Court has repeatedly reaffirmed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), *quoting Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). *See generally Bass,* 404 U.S. at 347–50, 92 S.Ct. 515.[16] These principles of lenity have also been applied in recent cases in this circuit.[17]

In addition to these general principles governing construction of criminal laws, yet another dimension is implicated in this case. We do not believe that Title VII

**15.** *See* [text at pp. 1300–1301] and note 7 *supra.*

**16.** As the Court stated in *United States v. Campos-Serrano,* 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971):

It has long been settled that "penal statutes are to be construed strictly," *Federal Communications Comm'n v. American Broadcasting Co.,* 347 U.S. 284, 296, 74 S.Ct. 593, 601, 98 L.Ed. 699, and that one "is not to be subjected to a penalty unless the words of the statute plainly impose it," *Keppel v. Tiffin Savings Bank,* 197 U.S. 356, 362, 25 S.Ct. 443, 445, 49 L.Ed. 790. "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–222, 73 S.Ct. 227, 229, 97 L.Ed. 260.

**17.** In *Simpson v. Simpson,* 490 F.2d 803 (5th Cir.), *cert. denied* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), a case concerning marital wire tapping under Title III of the same Omnibus Act of 1968, this court noted that "[t]he naked language of Title III, by virtue of its inclusiveness, reaches this case." 490 F.2d at 805. But because of the "far reaching result" ("one extending into areas normally left to the states, those of the marital home and domestic conflicts," *id.*) and the fact that Title III pre-

scribes severe remedies, including criminal sanctions, *id.* at 809, the court retreated from the statutory language, stating

We thus are bound by the principle that criminal statutes must be strictly construed, to avoid ensnaring behavior that is not clearly proscribed. . . . We consider this basic due process principle to be of considerable importance in this case, in light of our own inability to determine from the statute *and its legislative history whether one is prohibited from taping one's spouse's conversations within one's own home.*

*Id.*

In *United States v. Insco,* 496 F.2d 204 (5th Cir. 1974), this court cited the Supreme Court's decision in *Campos-Serrano* and went on to state

Where freedom is at stake, ambiguities and doubts as to statutory application, manifestly existing here, must be resolved in favor of the accused.

496 F.2d at 209. The court also noted that certain limiting principles of statutory construction have

peculiar force with respect to criminal statutes, which courts are compelled to construe rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language.

*Id.* at 206.

is a retroactive law in the ex post facto sense, *United States v. Donofrio,* 450 F.2d 1054 (5th Cir. 1971), disapproved on other grounds, *Bass, supra.* However, we are sensitive to the fact that if applied to make Matassini's 1955 pardon less than "full and complete," the federal statute will retrospectively impair the effect of that pardon. The Supreme Court has counselled us that

> a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

*Greene v. United States,* 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964), *quoting Union Pac. R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) [footnote omitted]. This principle has recently been adverted to by this court as well.[18]

### C.

Applying these principles of construction to Title VII's statutory language, legislative history, and the legislative purpose they evidence, we conclude that Congress did not intend, and did not provide, that a person in Matassini's position was liable to prosecution for violation of § 1202(a).

We believe it is clear that Congress, in enacting Title VII, intended the proscriptions of § 1202(a)(1) to reach persons convicted of felonies prior to 1968. We also believe that Congress intended that with respect to convicted felons pardoned after the enactment of the Omnibus Act, only those felons whose pardons contained a clear indication of express authorization would be permitted to receive, possess, or transport in commerce any firearm. Finally, we are prepared to believe that with respect to convicted felons pardoned prior to 1968,[19] Congress intended to permit receipt or possession of firearms only following a determination that the individual involved did not present a threat to public safety. Congress unmistakably confided power upon state governors to make such a determination. The critical question here is whether Congress also intended to require that pardons granted prior to 1968 include *words* of express authorization to evidence that such individualized consideration of the pardonee did take place.

Throughout this opinion, we have stressed that Matassini's pardon was granted prior to the enactment of the Omnibus Act in 1968. At the time the pardon was granted, only a crystal ball gazer of the most exquisite sensitivity could have divined that words of express authorization concerning firearms, or the absence of such words, would acquire talismanic significance thirteen, or twenty-one, years later, and retrospectively become necessary to effectuate the intent of the governor to grant a full and complete pardon. The Supreme Court has counselled us that one "is not to be subjected to a penalty unless the words of the statute plainly impose it," *Keppel v. Tiffin Savings Bank,* 197 U.S. 356, 362, 25 S.Ct. 443, 445, 49 L.Ed. 790 (1905), and that "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–22, 73 S.Ct. 227, 229, 97 L.Ed.

---

**18.** *United States v. Blue Sea Line,* 553 F.2d 445, 448 (5th Cir. 1977); *see De Rodulfa v. United States,* 149 U.S.App.D.C. 154, 161, 461 F.2d 1240, 1247, *cert. denied* 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972):

> Prospective rather than retrospective application is decidedly the preferred judicial treatment of legislation. "Retroactivity," the Supreme Court has declared," even where permissible, is not favored, except upon the clearest mandate."

*Id., quoting Claridge Apartments Co. v. Commissioner of Internal Revenue,* 323 U.S. 141,

164, 65 S.Ct. 172, 89 L.Ed. 139 (1944). *See also Hiatt v. Hilliard,* 180 F.2d 453 (5th Cir. 1950); *Wilson v. Retail Credit Co.,* 457 F.2d 1406 (5th Cir. 1972).

**19.** It might be argued that felons who have received "full and complete" pardons should not be regarded as "convicted felons." We are unpersuaded by this argument with respect to Title VII because Congress explicitly provided for the effect of a state pardon in § 1203(2). But *see* note 26 *infra,* considering the force of this argument with respect to Title IV.

260 (1952). As we ourselves have stated, "Where freedom is at stake, ambiguities and doubts as to statutory application . . . must be resolved in favor of the accused." *United States v. Insco*, 496 F.2d 204, 209 (5th Cir. 1974). Given that the legislative purpose has been substantially satisfied by Matassini's full and complete Florida pardon and that the statute does not "plainly impose" the requirement of *words* of express authorization with respect to pre-1968 pardons, we refuse to attribute to Congress the anomalous intent that pardoning authorities acting prior to 1968 foresee the necessitous significance of words of express authorization. While § 1203(2) may require that authorization to receive, possess, or transport in commerce a firearm be expressed *in haec verba*, more or less, with respect to state pardons granted subsequent to the effective date of the Omnibus Act, we hold that the full and complete Florida pardon granted to Matassini in 1955 was sufficiently express to satisfy the requirements of § 1203(2) and thus to exempt Matassini from the proscriptions of § 1202(a). Any other result would require of the pardoning authorities a degree of clairvoyance that would out-Merlin Merlin.

## III.

Having determined that Matassini's indictment under § 1202(a) was properly dismissed, we turn now to an examination of the § 922(h) receipt offense. In order to understand the statutory function contemplated for § 922(h), it is necessary to recognize that unlike the narrowly focused Title VII, Title IV enacted a rather comprehensive federal regulatory scheme governing interstate and foreign commerce in firearms.

Examination of the statutory framework established by Title IV [20] makes clear that the title is primarily addressed, as stated by the Senate Committee Report,[21] to

the licensing standards and the issuing of licenses to persons as federally licensed dealers, manufacturers, and importers in firearms.

Section 922(a) makes it unlawful for any unlicensed person "to engage in the business of importing, manufacturing, or dealing in firearms or ammunition . . . ." Section 923 establishes a procedure for federal licensing of importers, manufacturers, and dealers under the authority of the Secretary of the Treasury or his delegate ("Secretary"; *see* 18 U.S.C. § 921(a)(18)). Applications for licenses are to be approved by the Secretary if, among other conditions,

the applicant . . . is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (h) of this chapter,

§ 923(d)(1)(B).

Section 922(g) makes it unlawful for certain persons "to ship or transport any firearm or ammunition in interstate or foreign commerce." Section 922(h), the provision under which Matassini was indicted, makes it unlawful for certain persons "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." [22] Among the persons whose activities in interstate commerce are restricted by § 922(g) and (h) is any person

---

**20.** The amendments to Title IV enacted by the Gun Control Act of 1968, Pub.L. 90–618, 82 Stat. 1213, do not affect the issues presented in this case. Statutory citations are to the United States Code, which incorporates the Gun Control Act amendments.

**21.** *Report of the Senate Judiciary Committee*, S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted* in [1968] U.S.Code Cong. & Admin.News 2112, 2165. *See also Huddleston v. United States*, 415 U.S. 814, 825, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974).

**22.** Section 922(h) is a modified and recodified version of 15 U.S.C. § 902(f) (1964 ed.), 75 Stat.

757, which in turn amended the original statute passed in 1938, 52 Stat. 1250, 1251. *United States v. Bass*, 404 U.S. 336, 343 n.10, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). There can be no doubt that § 922(h), like § 1202(a), reaches the receipt offense, *Barrett v. United States*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). Within the framework of Title IV, § 922(h) serves a dual purpose, providing both a criminal prohibition on the receipt of firearms by certain persons (directly) and a condition for federal licensure of importers, manufacturers, and dealers in firearms (via § 923(d)(1)(B)).

(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year.

Relief from these disabilities is made available through an administrative proceeding under the authority of the Secretary, § 925(c).[23] Title IV, unlike Title VII, does not explicitly address the effect of a pardon.[24] The issue for decision here is whether the defendant's Florida pardon removes him from the statutory prohibition. We hold that it does. In so holding, we follow the lead established in this circuit by *United States v. Dameron*, 460 F.2d 294 (5th Cir.), *cert. denied*, 409 U.S. 882, 93 S.Ct. 168, 34 L.Ed.2d 137 (1972) (*"Dameron I"*); *judgment reversed on habeas*, 488 F.2d 724 (5th Cir. 1974) (*"Dameron II"*). In *Dameron I*, an appeal from a conviction under 18 U.S.C. § 922(g)(1) for interstate transportation of a firearm, the appellant argued that he was not guilty of the transporting offense "as he had been pardoned by the Governor of Arkansas [for the underlying felony convictions] before the indictment was returned," 460 F.2d at 294–95. The court rejected this argument, noting that the pardon was obtained *after* Dameron had been arrested on the weapons charge,

though before he was indicted. The court held that "[t]he subsequent pardon does not . . . free appellant from the legal consequences of his prior actions." *Id.* at 295. The court continued,

> The statutory prohibition was triggered by his status as a convicted felon, a status which did not change until the pardon was received. *The pardon simply came too late* to save appellant from this charge.

*Id.*[25] (Emphasis supplied). This statement, of course, implies that a timely pardon would exempt its recipient from prosecution under § 922.

One of the government's contentions is that a convicted felon who has received a state pardon expressly authorizing him to receive and possess firearms, thus satisfying the requirements of § 1203(2) for exemption from the proscriptions of § 1202(a), would nevertheless be subject to indictment under § 922(h). While cognizant "that Title VII was not carefully molded to complement Title IV," *Bass, supra,* 404 U.S. at 343–44, 92 S.Ct. at 520, and that conclusions cannot be drawn from one title concerning the correct interpretation of the other, *id.* at 344, 92 S.Ct. 515,[26] we refuse to attribute to Congress an intention in Title IV so thoroughly at war with the express provi-

---

**23.** *See* note 3 *supra* for a full citation of the statutory provision.

**24.** However, under administrative regulations promulgated by the Secretary, 27 C.F.R. § 178.-142,

> A pardon granted by the President of the United States regarding a conviction for a crime punishable by imprisonment for a term exceeding one year shall remove any disability which otherwise would be imposed by the provisions of this part in respect to that conviction.

**25.** *Dameron II, supra,* reiterated this language with respect to Dameron's pardon and went on to grant habeas relief on the ground that Dameron's underlying felony convictions were based upon uncounseled guilty pleas and were void *ab initio*. Since such convictions "cannot be judicially used for any purpose," 488 F.2d at 727, they do not provide the predicate for application of § 922(g)(1)'s prohibitions. *Cf. United States v. Ransom,* 545 F.2d 481 (5th Cir. 1977), and *United States v. Vice,* 562 F.2d 1004 (5th Cir. 1977) (permitting use of subsequently invalidated prior convictions under 18 U.S.C. § 922(a)(6), which proscribes knowingly mak-

ing a false statement in connection with the acquisition of a firearm; in both cases, the statements were false when made.) The *Dameron II* court concluded that it need not reach the constitutional issue; instead, it grounded its decision "on the meaning of the words of the statute which we hold do not cover a person whose felony conviction is unconstitutional," 488 F.2d at 727. "The statute should explicitly set forth application to unconstitutional convictions, if it is so intended," *id.* The same may be said with respect to pre-enactment pardons.

**26.** If the strictures against reasoning from Title VII to Title IV were indeed absolute, we would be inclined to affirm the dismissal of the § 922(h) indictment on another ground, that Matassini was not a convicted felon for purposes of Title IV. In rejecting this argument in the Title VII context, see note 19 *supra*, we stressed that by expressly providing for the effect of a state pardon in § 1203(2), Congress negated the possibility that a state pardon not meeting the requirements of that section could remove a convicted felon from the proscription

of § 1202(a). If that conclusion cannot be carried over to Title IV, which does not explicitly address the effect of a state pardon, a more thorough analysis is required to determine whether Congress intended to include recipients of full and complete state pardons in its definition of convicted felons.

We have no doubt that Congress is free, within constitutional limits, to choose its own indicia of dangerousness in constructing a regulatory scheme. It is not slavishly bound to follow the characterizations adopted by the states. But in Title IV, by identifying those subject to the proscription of § 922(h)(1) as "any person . . . who has been convicted in any court . . .," Congress chose to rely, at least in part, on state criminal law. We see no reason, in either the language or legislative history of Title IV, to doubt that Congress adopted the states' own definitions of conviction, including the effects of a pardon thereon. While

> we must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law,

*Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640 (1943), here we do have a plain indication to the contrary. With respect to Title IV, § 927 clearly indicates congressional intent that the federal statute be interpreted harmoniously with state law "unless there is a direct and positive conflict . . . so that the two cannot be reconciled . . .."

Our interpretation of the interplay of federal and state law is reinforced by careful examination of *Jerome* and the Supreme Court cases following it. In *Jerome,* a criminal case, the Court interpreted § 2(a) of the Federal Bank Robbery Act, 48 Stat. 783, 50 Stat. 749, 12 U.S.C. § 588(b), as not incorporating state law, first, so as to avoid creating dual state and federal criminal liability for the same act and second, to respect the tradition that administration of criminal justice under the federal system has generally rested with the states:

> where Congress is creating offenses which duplicate or build upon state law, courts should be reluctant to expand the defined offenses beyond the clear requirements of the terms of the statute,

318 U.S. at 105, 63 S.Ct. at 486. Effectuation of these policies in the context of the case at bar may require, rather than negate, the incorporation of a state's definition of the effect of a pardon. And this result is hardly foreclosed by decisions of the Supreme Court. *Jerome* itself recognized that Congress is perfectly capable of making the application of a federal statute dependent on state law. *Id.* at 104, 63 S.Ct. 483. *See also United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958). In *Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), the Court stated, in defining what constitutes "real property" for purposes of proper application of a federal statute,

> the Congressional purpose can best be accomplished by application of settled state rules . . . so long as it is plain, as it is here, that the state rules do not effect a discrimination against the government, or patently run counter to the terms of the Act.

*See generally* Hart and Wechsler, The Federal Courts and the Federal System, 492–94 (2d ed. 1973).

Our conclusion that Congress intended state law to govern the definition of conviction also follows the holding of then District Judge Tjoflat in *United States v. Hartsfield,* 387 F.Supp. 16 (M.D.Fla.1975). In that case, a Title IV prosecution not involving the pardon issue, Judge Tjoflat examined Florida law to decide "the critical question": "whether, at the time of purchase of the gun, defendant had been 'convicted' under state law." *Id.* at 17.

The state law in our case, as we have seen, is unambiguous. In construing statutory language almost identical to that of § 922(h)(1), the Florida Supreme Court determined "that pardoned convictions not be counted as prior 'live' felony convictions." *Fields, supra,* 85 So.2d at 611; *see* note 9 *supra.* A full and complete pardon under Florida law removes virtually all collateral consequences of the pardoned conviction: in addition to being restored to full and complete civil rights, a pardonee need not register as a felon, Fla.Stat.Ann. § 775.13, cannot be prosecuted as a habitual offender, Fla.Stat.Ann. § 775.084, cannot be impeached with evidence of his prior conviction, Fla. Evidence Code § 90.610(1)(b), and, not least, is entitled to possess a firearm, Fla.Stat.Ann. § 790.23(1). *See* notes 9, 10 and 11 *supra.* Under Florida law, and therefore under federal law for purposes of § 922(h), Matassini is not a convicted felon. And, since Florida law does provide, in Fla.Stat.Ann. § 112.011(b), that

> a person who has had his civil rights restored may be denied a license, permit, or certification to pursue, practice, or engage in an occupation, trade, vocation, profession, or business by reason of the prior conviction for a crime if the crime was a felony . . . and directly related to the specific occupation, trade, vocation, profession, or business for which the license, permit, or certificate is sought,

harmonization of Florida with federal law would carry no danger of frustrating the federal licensing scheme at the heart of Title IV.

We note the approach of the Ninth Circuit in *United States v. Hoctor,* 487 F.2d 270 (9th Cir. 1973), and *United States v. Potts,* 528 F.2d 883 (9th Cir. 1975) (en banc), overruling *Hoctor.* In *Hoctor,* the issue was whether a Washington expungement statute, Wash.Rev.Code § 995.-

sions of Title VII. Before concluding that Congress intended that a convicted felon must be both pardoned under § 1203(2) and granted administrative relief under § 925(c) in order to be protected from prosecution, we must require a far more clear and definite manifestation of that intent than Congress has here provided. *See* text accompanying notes 16 and 17 *supra*. In the absence of such clear intent, we believe that a pardon meeting the requirements of § 1203(2) and therefore precluding indictment for receipt and possession of firearms under § 1202(a) must also preclude prosecution for identical conduct under § 922(h).[27] Any other conclusion would, in our view, be unreasonable if not absurd.[28]

We are aware that at least one of our sister circuits has reached a different conclusion on the effect of pardons under Title IV in *Thrall v. Wolfe*, 503 F.2d 313 (7th Cir. 1974), *cert. denied* 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). We have carefully considered the reasoning in that case, but continue to believe that our approach in *Dameron I*, as further elucidated here, is

240 (1957), removed the defendant from the class of persons subject to 18 U.S.C. § 842(i), which prohibits convicted felons from transporting or receiving explosives in interstate commerce. The court

> concluded that the defendant was no longer a person who had been convicted of a felony, the reason being that his former 'conviction was absolutely erased from his record [and that he] was entitled to the same rights, and held the same status, as any citizen.' 487 F.2d at 271.

*Potts, supra,* 528 F.2d at 884. In overruling *Hoctor*, the *Potts* court reviewed the Washington statute and the state case law interpreting it, found that "expunged" convictions could "count as a conviction in any subsequent prosecution" and could be shown to impeach credibility in subsequent criminal prosecutions (thus effecting only a "partial erasure"), and concluded *"a fortiori"* that such a conviction could form the predicate for § 1202(a)(1) liability. In each of the specific respects considered by the Ninth Circuit, the expungement effected by the Washington statute fell short of the Florida pardon granted to Matassini. Six members of the en banc court, however, joined a concurring opinion viewing the state expunction statute as irrelevant to the proper interpretation of § 1202.

At least one circuit has determined that certain expungement statutes do remove those whose convictions were expunged from the class of persons subject to 18 U.S.C. §§ 1202 and 922, *United States v. Fryer*, 545 F.2d 11 (6th Cir. 1976) (Federal Youth Corrections Act, 18 U.S.C. §§ 5010(a), 5021(b)), *but see United States v. Kelly*, 519 F.2d 794 (8th Cir.), *cert. denied* 423 U.S. 926, 96 S.Ct. 272, 46 L.Ed.2d 254 (1975); *United States v. Mostad*, 485 F.2d 199 (8th Cir. 1973), *cert. denied* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974).

27. We are pleased to note that the government, at oral argument, did not press its position that a state pardon is utterly without effect in the Title IV context. Rather, the able Assistant U. S. Attorney recognized that the

> court can look at [§ 922] one of two ways . . . both of which are in accord with what we believe was congressional intent in passing [§] 922

and argued that if the court considered congressional intent to be *in pari materia* in §§ 922(h) and 1202(a), the court should assess the pardon granted to defendant Matassini in light of the standards established by Congress in § 1203(2).

28. There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words.

*Perry v. Commerce Loan Company*, 383 U.S. 392, 401, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966), *quoting United States v. American Trucking Assns.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). *See also Rector of Holy Trinity Church v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892):

> All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character.

*Id.* at 461, 12 S.Ct. at 512, *quoting United States v. Kirby*, 7 Wall. (74 U.S.) 482, 486, 19 L.Ed. 278 (1869).

more consistent with the language, policy and legislative history of Title IV, at least with respect to the receipt offense, § 922(h), here at issue.[29]

The *Thrall* court's most telling argument, given in response to the contention that Congress intended "that one holding a state pardon no longer be regarded as convicted within the meaning of § 922(g) and (h)," 503 F.2d at 316, concerned Title IV's provision for administrative relief. The court quoted § 925(c)[30] and went on to state

> It is unlikely that Congress intended, in effect, to confer an even broader power on the 50 state governors, free of the standards and limitations placed on the Treasury Secretary. If a state pardon were an alternative to relief under § 925(c), the exception for crimes involving a firearm would have little vitality. Further, Congress would have to have assumed that a state pardoning authority would always make a satisfactory investigation of the individual's record and reputation to determine his propensity for future violence.

*Id.* That, of course, is precisely what this same Congress not only assumed but explicitly provided for in § 1203(2), in a title specifically and exclusively targeted at the possession and receipt of firearms by those deemed a danger to public safety.

That point apart, the Seventh Circuit's argument is considerably more persuasive in the *Thrall* context that it is here. *Thrall* was not a criminal prosecution, but an action for review of an administrative determination denying Thrall's application for a license as a dealer and manufacturer of firearms. As we have seen, § 922(g) and (h) serve a dual function in the framework of Title IV; not only do they prohibit the receipt of firearms by persons deemed to be dangerous to public safety, but they define one of several criteria relevant to the Secretary's licensing functions under § 923(d). Thus, the Seventh Circuit's determination that gubernatorial pardons might be inconsistent with the "standards and limitations placed upon the Treasury Secretary," *id.* at 316, may be perfectly correct with respect to the licensing decision at issue in *Thrall*. But that is not the issue before us.[31] Where Congress spoke directly to the issue of receipt and possession in Title VII, outside the licensing context, it determined that a proper state pardon would exempt a convicted felon from the operation of the statute, § 1203(2). *See United States v. One Lot of Eighteen Firearms,* 325 F.Supp. 1326 (D.N.H.1971). Any other reading

---

**29.** The basic argument in *Thrall* runs as follows: (1) "There is nothing inherent in a state pardon which compels the federal government to disregard the pardoned offense." 503 F.2d at 315. (2) "Congress has the power to accord a state pardon differing effects in differing contexts, depending on its objectives in creating the disqualification. Neither the inherent nature of a pardon nor full faith and credit require that a state pardon automatically relieve federal disabilities." *Id.* at 316. (3) "We cannot conclude that Congress desired a gubernatorial pardon to have [the] effect", "that one holding a state pardon no longer be regarded as convicted within the meaning of § 922(g) and (h)." *Id.*

In reaching its third conclusion as to congressional intent, the *Thrall* court notes that
> Where Congress did intend that a state pardon exempt an individual from a portion of the federal gun control laws, it had no difficulty expressing that intention.

*Id.* at 317, referring to § 1203(2) of Title VII. That court thought
> that the absence of any comparable provision in Title IV (and the presence there of a provi-

sion for limited administrative relief) signifies that Congress did not intend that a state pardon affect the disabilities in that title. *Id.,* at 317–18. We have already noted that we do not believe contentions (1) and (2) are at issue in this case. The question presented here is not congressional power but congressional intent. *See generally* Note, 53 Texas L.Rev. 1332 (1975), for a cogent discussion of the *Thrall* decision.

**30.** *See* note 3 *supra* for a full citation of the statutory provision.

**31.** Our holding, that *criminal* liability for receipt of a firearm under § 922(h) does not attach to the recipient of a state pardon meeting § 1203(2) standards, does nothing to impede the Secretary in administering the federal licensing regime established by Title IV. Since the licensing aspects of Title IV are not duplicated in Title VII, our logic does not extend to the conclusion that a § 1203(2) pardon has any necessary effect with respect to applications for federal licenses.

would lead to absurd results; a convicted felon who received a state pardon expressly authorizing him to receive and possess a firearm, in full compliance with § 1203(2), would, under the *Thrall* rationale if extended to this case, be susceptible to conviction under § 922(h). We cannot believe that Congress intended so to entrap unwary recipients of state pardons, and, being neither bound nor enthralled by the Seventh Circuit's decision in *Thrall v. Wolfe*, decline to apply its lupine logic to the case before us.[32]

### IV.

In view of the length of our discussion, we reiterate briefly our principal conclusions.

■ In considering applications for pardons subsequent to 1968, state pardoning authorities are on notice of the requirements of federal legislation and may so articulate their grants of pardon (consistent with state constitutional and statutory authority) as to make explicit the intended consequences with respect to receipt and possession of firearms.[33] But this was not true prior to 1968. While § 1203(2) may require that authorization to receive, possess, or transport in commerce a firearm be stated in explicit and unmistakable terms with respect to state pardons granted subsequent to the effective date of the Omnibus Act, we hold that the full and complete Florida pardon granted to Matassini in 1955 was sufficiently express to satisfy the requirements of § 1203(2) and thus to exempt Matassini from the proscriptions of § 1202(a).

We further hold that any defendant, including Matassini, who can bring himself within the requirements of § 1203(2) is also exempt from liability for the receipt offense under § 922(h), although not exempt from the administrative procedures established by Title IV for licensing purposes. In so holding, we are being true to what we perceive to be the intent of Congress. We do not question the proposition that it is within the power of Congress, speaking clearly, to create an explicit federal rule

---

**32.** Our approach also finds support in several reported decisions. In *United States v. One Lot of Eighteen Firearms*, 325 F.Supp. 1326 (D.N.H.1971), a forfeiture action under § 924(d) of Title IV, the court held "[a] full [state] pardon can only be construed to restore to [defendant] all his rights, including the right to possess firearms." *Id.* at 1329. "To order forfeiture would be to impose a penalty for the offense which the pardon has effectively eliminated, and the basic purpose of a pardon is to prevent the imposition of penalties subsequent to its granting." *Id.* "Since the pardon has the practical effect of excusing a violation of [Title IV], I am of the opinion that it operates to prevent forfeiture." *Id.*

The Sixth Circuit, in *United States v. Barrett*, 504 F.2d 629 (6th Cir. 1974), *aff'd* on other grounds, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976), a § 922(h) case, while noting "that Section 922(h) contains no exemption for anyone who has been pardoned," and initially expressing doubt about the applicability of § 1203 to Title IV, 504 F.2d at 632, went on to a full discussion of the effect of Barrett's Kentucky pardon under Kentucky law and concluded, "[t]he present case involve[s] a question of Kentucky law relating to pardons, and appellant is bound by Kentucky law." *Id.* at 634. The Sixth Circuit determined "that the pardon in the present case was not a full pardon, but only a partial pardon." *Id.* In each crucial respect examined by the court, the Kentucky pardon granted to Barrett fell short of the Flori-da pardon granted to Matassini. In its review of *Barrett* on the question of the interstate commerce nexus required by § 922(h), the Supreme Court noted that the pardon issue "is not presented here," 96 S.Ct. at 500 n.3.

**33.** We note, for example, that Florida has adopted Rules of Executive Clemency, September 10, 1975, revised September 14, 1977, which specifically define the effects of various degrees of executive clemency. Under Rule 5A, a full pardon

unconditionally releases from punishment, forgives guilt and entitles an applicant to all of the rights of citizenship enjoyed by him before his conviction. It freely and unconditionally absolves the offender from all legal consequences of the conviction of an offense under Florida law.

Rule 6, governing the restoration of civil and residence rights short of a full pardon, explicitly provides that the "rights restored under this provision shall exclude the right to own, possess, use or transport in commerce a firearm." Rule 5E, however, provides for a grant of "Specific Authority to Own, Possess, or Use Firearms," which "restores to the applicant the right to own, possess or use firearms after the applicant's civil rights or residence rights have been restored." Rule 5E also cautions recipients of restoration of civil rights with "specific authority" of the existence of federal requirements relating to firearms.

pursuant to the supremacy clause defining the effect to be accorded a state pardon with respect to federal disabilities. We simply do not believe Congress has done so here. Retroactivity and prospectivity are not congressional novelties; had Congress intended that Matassini-type pardons be disregarded, it could have employed clear and definite language to that end. Statutory exclusion of this pardon should require luminous rather than opaque words. We believe the redemptive factors underlying Matassini's full and complete Florida pardon did have contemporary currency at the time the Omnibus Act was enacted. The wisdom of the Biblical injunction to "repent . . . that your sins may be blotted out" was recognized and given secular effect in Matassini's Florida pardon: once a felon, not always a felon. Let it be said that we construed the statutes as saying once a pardon, always a pardon—unless Congress chooses, in clear and definite language, to express a more niggardly concept.

## V.

Having disposed of both counts of the indictment against defendant Matassini, we return to the aiding and abetting count under 18 U.S.C. §§ 922(h) and 2(a) against defendant Rodriguez.[34] The test for aiding and abetting was stated by this circuit in *Hendrix v. United States*, 327 F.2d 971, 975 (5th Cir. 1964), *quoted* in *United States v. Blewitt*, 538 F.2d 1099, 1100–01 (5th Cir.) *cert. denied* 429 U.S. 1026, 97 S.Ct. 650, 50 L.Ed.2d 629 (1976):

> In order to sustain the conviction of a defendant who has been charged as an aider or abetter, it is necessary that there be evidence showing an offense to have been committed by a principal and that the principal was aided or abetted by the accused, although it is not necessary that the principal be convicted or even that the identity of the principal be established.

**34.** *See United States v. Falletta*, 523 F.2d 1198 (5th Cir. 1975), affirming a conviction for aiding and abetting under § 1202(a) and discussing the possible preclusive effect of § 922(d) on the aiding and abetting offense.

Our disposition as to defendant Matassini negates the existence of the offense; thus, the district court's dismissal of the indictment as to Rodriguez was also correct. Accordingly, with respect to the dismissal of all counts against both defendants, we AFFIRM.