**UNITED STATES of America, Plaintiff,**

v.

**James Ray ERWIN, Defendant.**

**No. 87–30045.**

United States District Court,
C.D. Illinois,
Springfield Division.

Oct. 24, 1989.

---

David E. Risley, Asst. U.S. Atty., Spring-field, Ill., for plaintiff.

Michael Metnick, Springfield, Ill., for defendant.

## OPINION

RICHARD MILLS, District Judge:

A novel question of statutory interpretation.

Defendant was found guilty by a jury in this Court of the federal offense of possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year. 18 U.S.C. § 922(g). Such crimes, however, are determined—in part—according to the law of the state in which the conviction was obtained, and do not include those cases in which a person's civil rights have been restored, unless the restoration of civil rights expressly excludes possession of firearms. 18 U.S.C. § 921(a)(20). Defendant was previously convicted of several felonies in Illinois, but he has completed serving his sentence for those crimes, and under Illinois law all "civil rights" are restored automatically upon completion of the sentence. Ill.Rev.Stat. ch. 38, ¶ 1005–5–5 (1989).

Defendant therefore argues that the underlying Illinois offense does not constitute a "crime punishable by imprisonment for a term exceeding one year" within the meaning of the federal statute, and therefore his conviction for violating that statute cannot stand.

The bottom line: Defendant's post-trial motion must be denied.

But first, the facts.

The indictment in this case charges that Defendant has been convicted of five previous felonies. Four convictions, one in 1968 and three in 1974, were for burglaries committed in various counties in Illinois. The fifth conviction was for an aggravated battery committed in Illinois in 1968. The indictment here further alleges that on or about May 10, 1987, Defendant knowingly possessed a firearm which had traveled in interstate commerce. The facts giving rise to this indictment stem from an altercation involving Defendant which occurred in May of 1987. At trial, the Government introduced evidence that Defendant had entered the residence of one Ronald B. Mabe on the night in question and threatened him and his family with a handgun. Following a three day trial, the jury found Defendant guilty of violating 18 U.S.C. § 922(g) and subject to the enhanced penalty provisions of § 924(e).

Thereafter, Defendant renewed a *motion* for a judgment of acquittal and to preclude enhancement of penalty which had first been made at the close of the Government's case. This Court reserved ruling on these motions pending completion of research by the U.S. Attorney concerning the treatment by other states of convicted felons' restoration of civil rights. That research has now been completed, Defendant has responded to the Government's research memorandum, and two hearings have been held.

The motion is thus ripe for ruling.

## I. APPLICABLE STATUTES

The motion before the Court involves the interplay of various federal and Illinois statutory provisions. These statutes shall be set out here for later reference.

Section 922(g) of Title 18 of the United States Code states that "[i]t shall be unlawful for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ... possess in or affecting commerce, any firearm or ammunition." Prior to 1986, the only means of relieving such a disability was to petition the Secretary of the Treasury pursuant to § 925(c); this provision is still extant, and in pertinent part provides that

the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.

These two provisions—§ 922(g) and § 925(c)—were enacted as portions of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 226 (hereinafter referred to as Omnibus Act). Contemporaneously enacted was Title VII of that Act, which became codified at 18 U.S.C. app. §§ 1201–1203. This Title overlapped to a degree with provisions of Title IV; it too, for instance, made it illegal for one who "has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony ... [to receive, possess, or transport] in commerce or affecting commerce ... any firearm," 18 U.S.C. app. § 1202(a), and "felony" was similarly defined as "any offense punishable by imprisonment for a term exceeding one year." In contrast to the provisions of Title IV, however, Title VII provided a separate means for securing relief from the disability created; section 1203(2) expressly exempted from Title VII's reach "any person who has been pardoned by the President of the United States or the chief executive of a State and has expressly been authorized by the President or such chief executive, as the case may be, to receive, possess, or transport in commerce a firearm."

Provisions of both Titles IV and VII of the Omnibus Act were materially altered by the 1986 passage of the Firearms Owners' Protection Act, Pub.L. 99–308, 100 Stat. 449. For one thing, § 104(b) of this later Act wholly repealed Title VII of the Omnibus Act, 18 U.S.C. app. §§ 1201–1203. An additional alteration relevant for our

purposes is found in § 101 of the Firearms Owners' Protection Act. This section amended § 921(a)(20), defining "crime punishable by imprisonment for a term exceeding one year," by adding this language:

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

Defendant has latched onto the amended § 921(a)(20) in an attempt to avoid his present federal conviction. Although he admits to having been convicted in Illinois courts on several occasions, he argues that these are not "convictions" within the meaning of § 921(a)(20) because Illinois has restored his civil rights following those convictions. Defendant premises this argument on Ill.Rev.Stat. ch. 38, ¶ 1005–5–5 (1989), which states in part:

(a) Conviction and disposition shall not entail the loss by the defendant of any civil rights, except under this Section and Sections 29–6 and 29–10 of The Election Code, as now or hereafter amended.

(b) A person convicted of a felony shall be ineligible to hold an office created by the Constitution of this State until the completion of his sentence.

(c) A person sentenced to imprisonment shall lose his right to vote until released from imprisonment.

(d) On completion of sentence of imprisonment or on a petition of a person not sentenced to imprisonment, all license rights and privileges granted under authority of this State which have been revoked or suspended because of a conviction of an offense shall be restored unless the authority having jurisdiction of such license rights finds after investigation and hearing that restoration is not in the public interest....

Notwithstanding ¶ 1005–5–5, another statute, ch. 38, ¶ 24–1.1 of the Illinois Revised Statutes, makes it

unlawful for a person to knowingly possess ... any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction. This Section shall not apply if the person has been granted relief by the Director of the Department of State Police pursuant to [Ill. Rev.Stat. ch. 38, ¶ 83–10].

This provision became effective in 1984, pursuant to P.A. 83–1056, and therefore was in effect during the time period alleged in the present indictment. A previous disqualification was found at ¶ 24–3.1(a)(3), which made illegal the possession of firearms by any person who "has been convicted of a felony under the laws of this or any other jurisdiction within 5 years from release from the penitentiary or within 5 years of conviction if penitentiary sentence has not been imposed."

Finally, Defendant notes that at the time of the firearm possession alleged in this indictment he possessed a Firearm Owners' Identification (FOID) card issued by the Illinois Department of State Police, and the FOID card was taken away only after the firearm possession alleged in this indictment. It is also notable, however, that Defendant apparently has never either applied for or been granted relief from his Illinois firearm disability pursuant to ch. 38, ¶ 83–10; further, the Act which established the procedures for obtaining a FOID card also provides that "[n]othing in this Act shall make lawful the acquisition or possession of firearms or firearm ammunition which is otherwise prohibited by law." Ill.Rev.Stat. ch. 38, ¶ 83–13 (1989).

## II. INTERPRETATION

### (A) Overview

We begin our analysis by noting the issues presented and the ambiguities to be resolved, as well as the tools available for our use. Defendant argues that he is not a "convicted felon" within the meaning of 18 U.S.C. § 922(g) because his civil rights

have been restored by virtue of Ill.Rev. Stat. ch. 38, ¶ 1005-5-5; the restoration of civil rights was manifested by the issuance to him of an Illinois FOID card despite his earlier convictions.

The Government's response is double-barreled: first, the Government contends that Defendant's restoration of civil rights was automatic under Illinois law, while § 921(a)(20) contemplates some considered affirmative act; second, the Government argues that Ill.Rev.Stat. ch. 38, ¶ 24-1.1, making it illegal for a convicted felon to possess a firearm, constitutes an express limitation upon Defendant's restoration of civil rights, thus leaving Defendant within the prohibited class of those convicted of a crime punishable by one year's imprisonment within the meaning of § 921(a)(20). Finally, the Government also notes the irrelevance of Defendant's FOID card, since an Illinois statute unequivocally provides that mere possession of such a card does not legitimize an otherwise illegal firearm possession.

As presented to the Court, § 921(a)(20) contains at least three ambiguities. The first two were identified by the Government and addressed by the parties, while the third was only tangentially raised and argued to the Court.

The first ambiguity concerns whether § 921(a)(20) requires that a restoration of civil rights be accomplished by some affirmative act. The wording of the statute would support such a view, as do certain persuasive authorities. On the other hand, the statute's language would equally support an interpretation that automatic restorations effectively render convictions null under § 921(a)(20), and this is further borne out by certain facets of the history of the Firearms Owners' Protection Act.

The parties have likewise addressed the ambiguity of the portion of § 921(a)(20) which states that a "conviction" is still a "conviction" within the statute's meaning in spite of a restoration of civil rights where "such … restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." Chapter 38, ¶ 24-1.1 of the Illinois

Revised Statutes expressly makes illegal the possession of firearms by convicted felons, and the Government contends that this amounts to an "express provi[so]" to the "restoration of civil rights" accomplished in Ill.Rev.Stat. ch. 38, ¶ 1005-5-5. Defendant rejoins that his ¶ 1005-5-5 restoration was automatic and had only a few express limitations, none of which pertained to firearms. Again, as with any ambiguity, the pertinent statute's language supports either reading. The Government also points to aspects of the legislative history to further support its argument; Defendant likewise is supported by statutory history, in addition to some case law.

Finally, the Court has noted an ambiguity which has largely eluded the parties but which seems to be at the very heart of this problem. In a nutshell, both 18 U.S.C. § 921(a)(20) and Ill.Rev.Stat. ch. 38, ¶ 1005-5-5, speak of the "restoration of civil rights," but do they mean the same thing? More to the point, at issue is what § 921(a)(20) contemplates by "restoration of civil rights," and whether ¶ 1005-5-5 fully meshes with the federal meaning. The statutes and their respective judicial interpretations indicate that the two do not attach identical meanings to the words "restoration of civil rights," and this is borne out by the legislative history of § 921(a)(20) as well.

The Court's task is to sort through these ambiguities to discern the statute's meaning. Of course, it cannot be gainsaid that our " 'starting point' must be the language of the statute itself," *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979)). Were the language here unambiguous we would be bound to find it "conclusive" absent some " 'clearly expressed legislative intent to the contrary,' " *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983) (quoting *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)), but of course we have already found several ambiguities in this statute.

Our mission, therefore, is to match the language of the statute with the Congressional purpose in enacting the statute in order to divine the legislative intent. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). Indeed, legislative intent is the bottom line in any statutory interpretation, for though the legislature speaks to its constituents through legislation, the courts must at times intercede to explain to the constituency precisely what the legislature meant. This is just such a time.

That being said, we have at our disposal various interpretation tools to assist in gauging legislative intent. Of course we look first to the statute's language, but we must be sure to look at that language as did the legislature. We therefore must consider the goals meant to be attained by enacting the statute, and this in turn requires that we consider the perceived failings of the prior law. Placed in its correct context, the statute's language may lose some of its ambiguity, and it might lose more when we consider the logical implications of the statute's internal order and its position with respect to other statutory provisions. Finally, we may consider recorded statutory history, such as Senate or House Reports and floor debates, once we have a preliminary idea of what the statute does or does not mean; these secondary legislative sources are most dependable to verify an interpretation first arrived at from more reliable sources. *See generally* R. Dickerson, *The Interpretation and Application of Statutes* (1975).

### (B) A History of Section 921(a)(20)

We begin our task by first considering the state of the law prior to enactment of the language in question, and the failing the legislature may have found in that law. The prior and new statutes have already been set out in full, but to briefly reiterate, prior to 1986 two partially overlapping statutes covered firearm possession by convicted felons—§ 922(g) and (h) and § 1202. While the former of these made no provision for relief from the disability created short of receiving special attention from the Secretary of the Treasury, the latter explicitly exempted from its reach those having received a Presidential or gubernatorial pardon, but only where the pardon expressly renewed the right to possess firearms. Beyond that, though, neither statute made any provision for convicted felons whose underlying convictions had been expunged or otherwise nullified by the state which entered them.

The original intent of both § 922(g) and (h) and § 1202 seems reasonably clear. Congress, in enacting the Omnibus Act in 1968, was concerned about widespread firearm abuse by convicted felons and with increasing domestic political assassinations, and so painted with a broad remedial brush to combat the problems. *Lewis v. United States*, 445 U.S. 55, 60–63, 100 S.Ct. 915, 918–20, 63 L.Ed.2d 198 (1980). Still, § 1202 was ill-conceived from its inception; although it was a part of the Omnibus Crime Control and Safe Streets Act of 1968, it was only added as a floor amendment to the Act and it engendered precious little discussion as to its own merits. This in part accounts for the overlap between some sections of that Act. More importantly, the sweeping statutory language of both § 922(g) and (h) and § 1202 necessitated a great deal of judicial interpretation.

Among the highlights of judicial interpretations of these statutes, the Supreme Court in *Lewis*, 445 U.S. at 67, 100 S.Ct. at 921, held that § 1202 prohibited possession of a firearm even where the defendant's underlying felony conviction was vulnerable to a collateral attack upon its constitutionality. The Court considered the sweeping language of the statute and its broad remedial purpose, and held that even though the defendant had not had counsel during the underlying felony proceedings in violation of the rule of *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the conviction could stand as the basis for the later federal firearm conviction. Three years later, in *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 112, 103 S.Ct. 986, 991, 74 L.Ed.2d 845 (1983), the Court elaborated upon the *Lewis* holding and found the peti-

tioner was not entitled to a license to deal or manufacture firearms or ammunition because he had previously been convicted of a state felony even though the felony conviction had been expunged from the state court's record following the successful completion of probation. The Court noted that "[a]lthough we have searched diligently, we have found nothing in the legislative history of Title IV or related federal firearms statutes that suggests, even remotely, that a state expunction was intended automatically to remove the disabilities imposed by sections 922(g)(1) and (h)(1)," *id.* at 119, 103 S.Ct. at 995, and later remarked that "[a]ny potential harshness of the federal rule is alleviated by the power given the Secretary to grant relief where relief is appropriate based on uniform federal standards." *Id.* at 120, 103 S.Ct. at 996.

The Supreme Court has not been alone in strictly construing these gun control provisions. Among the notable cases considering the Omnibus Act, the court in *United States v. Engesser,* 788 F.2d 1401 (9th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986), construed § 1203 to require a pardon expressly renewing the right to possess firearms, and not a mere automatic restoration of rights. The defendant had argued that the constitution of the state in which he had been convicted automatically restored his "[f]ull rights" once his state supervision terminated, and that this was the functional equivalent of an executive pardon restoring those rights. *Id.* at 1405. The court was unmoved by the argument, though, and citing *New Banner Institute* held that the defendant had not received a pardon and so was not entitled to § 1203 relief. *Id.*

A similar result was reached in *United States v. Sutton,* 521 F.2d 1385 (7th Cir. 1975), where the defendant had been convicted in 1963 of an Illinois felony, but in 1966 was issued by the Governor a certificate restoring all rights of citizenship forfeited by his felony conviction. The defendant was later issued a FOID card, and he thereupon purchased two firearms, for which he was later charged with a federal firearms violation. Even though Illinois

apparently would have allowed the defendant to legally possess the firearms, the Seventh Circuit affirmed his conviction on the basis that he had not received an express executive authorization to possess firearms. The court stated that "[u]nder section 1203(2), a state pardon, regardless of its effect in restoring all state-imposed disqualifications, relieves federal section 1202 liability only when the governor has considered the federal policies underlying the Act." *Id.* at 1309. *See also United States v. Kelly,* 519 F.2d 794 (8th Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 272, 46 L.Ed.2d 254 (1975) (reaching identical conclusion where underlying conviction was subject to a youthful offender expungement statute).

In *United States v. Allen,* 699 F.2d 453 (9th Cir.1982), the court decided the same issue on a different ground. The defendant's predicate felony had occurred in North Carolina, but as in *Engesser* the state, by statute, restored all civil rights upon conclusion of imprisonment, and another statute allowed convicted felons to again possess firearms five years following completion of the felony sentence. The court, however, rejected the argument that "under the statutory scheme of North Carolina [defendant] has been given the functional equivalent of [a § 1203(2) ] pardon and authorization," *id.* at 456–57, holding instead that the defendant "belongs to that class of convicted felons whose civil rights have been restored by general statute, rather than individually by the governor's pardon. If Congress had desired to extend the exemption to persons in this class, it could easily have done so."

*See also, generally,* Annotation, *Validity, Construction, and Application of Provision of Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. App. § 1202(a)(1)) Making It Federal Offense For Convicted Felon to Possess Firearm,* 13 A.L.R. Fed. 103, §§ 8 & 10 (1972); Annotation, *State Pardon as Affecting "Convicted" Status of One Accused of Violation of Gun Control Act of 1968 (18 U.S.C. §§ 921 et seq.),* 44 A.L.R. Fed. 692 (1979). *See also Thompson v. Department of the Treasury,* 557 F.Supp. 158, 165 n. 13

(D.Utah 1982) (holding that state expungement did not constitute a pardon within the meaning of § 1203, regardless of the fact that Utah had no separate provision for executive pardon); *United States v. Rossi*, 579 F.Supp. 688 (D.Mass.1984).

One further case in this league warrants mention here. In *Thrall v. Wolfe*, 503 F.2d 313 (7th Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975), the court affirmed the disqualification of a convicted felon from obtaining a license as a firearm dealer and manufacturer despite the felon's possession of a gubernatorial pardon which expressly restored the right to possess firearms. Although the court noted that the pardon would effectively preclude a § 1202 prosecution, the pardon was immaterial as to Title IV of the Omnibus Act, which included provisions for licensure of gun dealers and manufacturers. Hence, even though the *Thrall* plaintiff could not have been prosecuted for possessing a firearm under § 1202, he was precluded from all other firearm transactions prohibited by § 921 et seq.

Not all courts construing the Omnibus Act narrowly construed the Act in favor of strict enforcement. Indeed, the Supreme Court considered both the *New Banner Institute* and *Lewis* cases due to contrasting decisions in the appellate courts on those and other issues. For instance, in *United States v. Matassini*, 565 F.2d 1297 (5th Cir.1978), the court held that a full and complete pardon issued by the governor but which did not expressly allow the defendant to possess firearms nevertheless precluded a § 1202 prosecution. The court noted that the state pardon reinstated the defendant's state right to possess firearms even without the express language required by § 1203, and additionally noted that the pardon was procured prior to passage of the Act, concluding that "Congress did not intend, and did not provide, that a person in Matassini's position was liable to prosecution for violation of section 1202(a)." *Id.* at 1307. Moreover, the *Matassini* court also found that the state pardon exempted the defendant from prosecution under Title IV of the Act—specifically, under § 922(h). Indeed, in reaching this latter conclusion the court noted that "[w]e see no reason, in either the language or legislative history of Title IV, to doubt that Congress adopted the states' own definitions of conviction, including the effects of a pardon thereon," and since "[a] full and complete pardon under Florida law removes virtually all collateral consequences of the pardoned conviction [including the right to possess a firearm], [u]nder Florida law and therefore under federal law for purposes of section 922(h), Matassini is not a convicted felon." *Id.* at 1309–10 n. 26. This latter conclusion, of course, was effectively overruled by the *New Banner Institute* case.

One final case requires our consideration here. In *United States v. One Lot of Eighteen Firearms*, 325 F.Supp. 1326 (D.N.H.1971), the court reached the same conclusion as had the *Matassini* court. The convicted felon had not been indicted, but his firearms were seized and a forfeiture action was commenced pursuant to § 924(b). The convicted felon claimed lawful possession of the weapons—his 1944 conviction had been the subject of a 1969 gubernatorial pardon (which was made after commencement of the forfeiture action); the pardon was a "full" pardon construed by the court to include the right to possess firearms, but the pardon itself did not expressly so state. The court denied the Government's application for forfeiture, finding decisive the fact that the state allowed the convicted felon to once more possess guns, even though the pardon was silent on that point.

These, then, were the interpretations of the prior law that were before Congress as it considered the Firearms Owners' Protection Act and the potential additions to § 921(a)(20). The legislature also had for its consideration various reports and oral testimony concerning the intended results and rationale behind various provisions of the Act; while we recognize the limited value of these materials in making our present determinations, one matter warrants highlighting here. Of all the legislative materials identified by the parties as relating to the question before the Court,

Sen.Rep. 98–583 offers the most thorough discussion of the amendment to § 921(a)(20). The report notes that the amendment

requires that a "conviction" must be determined in accordance with the law of the jurisdiction where the underlying proceeding was held.... Finally, [the amendment] would exclude from such convictions any for which the person has received a pardon, civil rights restoration, or expungement of the record. Existing law incorporates a similar provision with respect to pardons in 18 U.S.C. app. 1202, relating to possession of firearms, but through oversight does not include any conforming provision in 18 U.S.C. 922, dealing with their purchase or receipt. This oversight, which resulted in a ruling that a state pardon does not permit a pardoned citizen to receive or purchase a firearm, despite the express provision in the pardon that he may possess it, would be corrected. In the event that the official granting the pardon, restoration of rights, or expungement of record does not intend that it restore the right to firearm ownership, this provision honors that intent as expressly provided in the order or pardon.

*Id.* at 7 (footnotes omitted). Significantly, this report cites as two cases whose holdings would be reversed by the amendment *Dickerson v. New Banner Institute, Inc.* and *Thrall v. Wolfe. Id.* n. 16 and n. 17.

The above constitutes the context within which § 921(a)(20) was amended to tie the definition of "conviction" to state law and to broaden the exclusion from convictions to include instances of expungement, setting aside or restoration of civil rights, in addition to cases of executive pardon. This history, we feel, will at this time support at least one general observation—the primary motivation in amending § 921(a)(20) was to eradicate anomalous federal and state decisions as to the effect, vis-a-vis gun possession, of a prior state felony conviction. A corollary to this observation is that, in broadening the types of state relief to be federally recognized as nullifying a conviction, Congress was chiefly concerned with giving effect to state determinations of firearm possession eligibility in order to unify federal and state approaches.

## III. ANALYSIS

### (A) Introduction

At the risk of redundancy we shall iterate the issues facing the Court. Defendant was convicted in 1968 and 1974 of felonies in Illinois, which led to his current § 922(g) conviction for possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year. Defendant argues, however, that by definition he has no such "conviction" because § 921(a)(20) says that "conviction" does not include instances where, *inter alia,* a person's civil rights have been restored, and an Illinois statute, ¶ 1005–5–5, provided for the automatic restoration of his civil rights as soon as he had completed the respective sentences—all of which were completed prior to the current firearm possession. Defendant points out, in support, that at the time he was arrested he possessed a duly issued Illinois Firearm Owner's Identification (FOID) card, which illustrates his lawful possession of firearms within Illinois.

Defendant's argument has raised three issues for interpretation. The Government has made two arguments opposing Defendant's contention. First, the Government argues that an affirmative act of relief from the underlying convictions is required by § 921(a)(20), whereas here the Defendant's civil rights restoration was automatic. The Government secondly argues that an Illinois statute limiting convicted felons' rights to possess weapons, notwithstanding ¶ 1005–5–5, constitutes an express proviso to the restoration of rights within the meaning of § 921(a)(20). Finally, as we noted above, the Court has identified a third issue not directly addressed by either party. Specifically, we question whether the words "civil rights" have the same meaning in § 921(a)(20) and ¶ 1005–5–5 such that the latter encompasses all contemplated by the former.

We will at this juncture make quick work of Defendant's contention that his posses-

sion of a FOID card is in any way relevant here. Defendant initially sought issuance of a FOID card because Ill.Rev.Stat. ch. 38, ¶ 83–2(a) requires a person to have a FOID card before acquiring or possessing firearms. Paragraph 83–4(a)(2)(ii) requires an applicant for such a card to certify that "[h]e has not been convicted of a felony under the laws of this or any other jurisdiction," and ¶ 83–5 provides for approval or denial of the FOID card application by the State Police. In the instant case the State Police approved Defendant's application, presumably at least in part because of his apparently perjurious certification that he had not been previously convicted of a felony. But the FOID card itself is of no moment, for ¶ 83–13 makes the unequivocal statement that "[n]othing in this Act shall make lawful the acquisition or possession of firearms or firearm ammunition which is otherwise prohibited by law." The "otherwise prohibited by law" is in this case found at Ill.Rev.Stat. ch. 38, ¶ 24–1.1, which equally unequivocally renders illegal the possession of firearms by convicted felons. Putting the two together, ¶ 24–1.1 made it illegal, under Illinois law, for Defendant to possess firearms, and ¶ 83–13 states that Defendant's possession of a FOID card, standing alone, will not rescue him from a charge of violating ¶ 24–1.1. *See also United States v. Sutton*, 521 F.2d 1385, 1389 (7th Cir.1975); *United States v. Oliver*, 683 F.2d 224, 229–30 (7th Cir.1982).

We will also at this time distinguish the only two cases discovered to date which apply the amended § 921(a)(20). In *United States v. Kolter*, 849 F.2d 541 (11th Cir. 1988), the defendant's underlying conviction had been made pursuant to Georgia's Youthful Offender Act, but "[i]n 1976, the State Board of Pardons and Paroles unqualifiedly restored all the civil and political rights Kolter had lost as a result of [the conviction]." *Id.* at 542–43. The defendant was later charged in federal court, though, with possessing a firearm. The amended definition of "convicted felon" became effective four days before the federal trial, and the defendant convinced the Eleventh Circuit that the amendment applied to him. Since by definition he was no longer

federally barred from possessing a firearm, the appellate court ordered the indictment dismissed.

The only possible relevance *Kolter* could have here is by way of dicta, but in fact even that is absent. The restoration of rights in *Kolter* was apparently deliberately and affirmatively accomplished pursuant to the Youthful Offender Act, and apparently it included the state right to possess firearms and, of course, contained no express limitation upon possessing firearms. The case therefore has no relevance to any of the three issues in this case.

*United States v. Presley*, 667 F.Supp. 678 (W.D.Mo.1987), *aff'd*, 851 F.2d 1052 (8th Cir.1988), is likewise unhelpful. There the defendant's civil rights were expressly preserved in spite of his state conviction, with the exceptions that as a convicted felon he could not serve as a juror or as a sheriff or highway patrol officer. The court was silent as to whether the defendant retained a state right to possess firearms, but construed "restoration of civil rights" as meaning "a general, substantially complete restoration of civil rights rather than absolutely total restoration of such rights." 667 F.Supp. at 679. The court then decided that, in balance, the limitations placed upon convicted felons in Missouri were enough that it could not be said "that Missouri has substantially preserved or restored the civil rights of released convicts, as contemplated by Congress." *Id.*

In the first place, this Court must respectfully disagree with *Presley*'s focus upon such far-flung disabilities as jury service and law enforcement employment. As we shall shortly address, this Court's view is that the primary concern in deciding whether a "restoration of civil rights" has been accomplished is whether the defendant has been restored to the state right to possess firearms. Other "civil rights" affected by a felony conviction are potentially irrelevant for federal purposes, and we would be willing to hold that jury service and police employment, standing alone, are so irrelevant.

Secondly, *Presley* has no bearing upon either issue identified by the parties here—

the case makes no mention of whether an affirmative act of restoration is required, nor of whether a state disqualification from firearm possession notwithstanding a state's restoration of civil rights amounts to an express proviso to that restoration. *Presley* does speak to the issue posited by the Court—that is, whether the Illinois and federal definitions of "civil rights" mesh in terms of § 921(a)(20)—but as above noted, we disagree with the working definition given to "civil rights" by *Presley*, and therefore do not find it instructive as to the third issue facing us, either.

### (B) Requirement of an Affirmative Act

■ Section 921(a)(20) provides that state law will generally determine what is and is not a conviction within the meaning of § 922 and that "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter." The Government argues that this language should be read to require some affirmative act of restoration by the sovereign which imposed the conviction, as opposed to the automatic restoration of civil rights applicable to Defendant. Conversely, Defendant argues that the statute contains no such requirement, nor should one be read into it.

The Government has some support for its position. The language of the statute, in fact, could be construed to imply such a requirement. The provision contemplates four types of relief from disabilities—expungement, setting aside, pardon and restoration of civil rights—and of these the first three are commonly accomplished by means of an affirmative act. Applying the canon of interpretation known as *noscitur a sociis*—a word is known from its associates—the section could be read to imply that any state act of granting relief from firearm disabilities will likewise relieve the federal disability, so long as the state relief is accomplished with an affirmative act. Then, too, certain legislative history supports this reading. For instance, during floor debate on July 9, 1985, Senator Hatch apparently noted that the amended section

would benefit anyone "who *secures* a pardon, restoration of civil rights, or whose record has been expunged." 131 *Congressional Record* S. 9125 (July 9, 1985) (emphasis added). The Government also has presented the Court with the case *United States v. Hefner*, 842 F.2d 731 (4th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988), which involved the disqualification of a grand juror because of a previous felony conviction; however, the disqualifying statute, 28 U.S.C. § 1865(b)(5), expressly exempts those whose civil rights have been restored. The *Hefner* grand juror had had some civil rights automatically restored, such as his eligibility to vote and to hold certain political positions, but the appellate court noted that the civil rights were not "restored by an affirmative act such as pardon, amnesty or expunction of his conviction," and held "that some affirmative act recognized in law must first take place to restore one's civil rights to meet the eligibility requirements of section 1865(b)(5)." *Id.* at 732.

Although the Government's argument and authorities have some surface appeal, on balance we find them unpersuasive. For instance, isolated language found in the legislative history does support the Government's position, but language can also be found supporting the opposite conclusion—the portion of Sen.Rep. 98–583 set out earlier, for example, speaks in a passive voice of "exclud[ing] from such convictions any for which the person *has received* a pardon, civil rights restoration, or expungement of the record" (emphasis added). This language suggests that a restoration of rights might be effective even though accomplished automatically. Further, the *Hefner* case's conclusion that 28 U.S.C. § 1865(b)(5) requires an affirmative act is not overly useful, since that statute and the Firearms Owners' Protection Act were not addressing the same policy concerns. For one thing, the latter Act is part of a criminal statute establishing the parameters of lawful conduct, and we would be loathe to imply a requirement not expressed by the terms of the statute itself. Finally, although the canon of construction

*noscitur a sociis* is often useful to bound an otherwise overly expansive meaning ascribed to a group of words, in this case applying the canon to find the meaning ascribed by the Government would overly limit the words' meaning. Moreover, the canon is inapplicable here for the Government's use anyway, since expungements, in addition to restorations of rights, may be accomplished automatically.

Instead of the above authorities, this Court finds most persuasive the language of the statute itself in the context of its predecessor. As we have taken pains to show, under earlier law a defendant could escape a federal firearm conviction only by showing that he had been affirmatively restored to his rights, and those rights had to expressly include firearm rights. This led to such results as continued federal disability in spite of state expungement of a previous conviction, and also to federal firearms convictions in spite of automatic renewal of the right, accorded by the involved state, to possess weapons. When Congress amended § 921(a)(20), it not only renewed the previous relief of obtaining a pardon, but also included all other methods by which states had restored rights lost through conviction, and this, as the case law indicates, includes automatic restorations of rights. Indeed, research prepared by the Government at the Court's request supports this conclusion. The Government surveyed the law of all 50 states plus the District of Columbia to compare the various procedures for restoring civil and firearms rights. The final report indicates that 22 states have some statutory provision for the automatic restoration of civil rights. We must assume that Congress was aware of this widespread practice, especially in light of the numerous cases discussing automatic restoration provisions.

Additionally, the language of the amended definition itself supports this conclusion. Aside from the four methods of relief from disabilities recognizable in federal actions, the statute also notes that "[w]hat constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." As noted earlier, the legislative history indicates that Congress intended by this sentence to reverse the rule of the *New Banner Institute* case, in which the convicted felon's conviction had automatically been nullified, according to state law, upon the completion of his probationary period. It would therefore appear clear that Congress contemplated automatic relief from disabilities by this section. Hence, we hold that § 921(a)(20) does not require that a restoration of civil rights be accomplished by some affirmative act to accord a defendant the benefits of the section.

### (C) Express Exception

The Government next contends that relief is not available to Defendant pursuant to § 921(a)(20) because the restoration of civil rights accorded him "expressly provides that the [Defendant] may not ship, transport, possess, or receive firearms." The Government concedes that Ill.Rev.Stat. ch. 38, ¶ 1005–5–5 restores to Defendant his "civil rights," but argues that ¶ 24–1.1, which makes it a state crime for a convicted felon to possess firearms, is an "express exception" to the restoration of civil rights within the meaning of § 921(a)(20). The Government supports its view by pointing out that 22 states have statutes ostensibly restoring "civil rights," but only two of those states include with that restoration the right to possess firearms. From this the Government concludes that when most states restore "civil rights" what they really mean are "political rights" such as suffrage and holding elected office, and the states' refusal to renew firearm rights act as "express exceptions" to their respective restoration of civil rights acts.

The Government's points are well-taken, but only with respect to other language in § 921(a)(20). As for the "expressly provides" language, we cannot take the leap asked of us by the Government. Again we look to the statute's language in light of its context to make our interpretation. Under prior law no state pardon could effectively relieve the federal firearm disability unless the state pardon itself expressly renewed the convicted person's state right to pos-

sess firearms. Once again this led to such results as federal convictions in spite of state expungements, pardons or other restorations which allowed the defendant to possess firearms, because the state action did not include an express executive determination that the defendant could possess firearms. In addition to broadening the types of state relief recognizable for federal purposes, the amended § 921(a)(20) turns the tables on the presumption, as it were, to be accorded state relief. No longer will convicted felons risk prosecution unless their pardons allow firearm possession—instead they are protected from federal prosecution unless their state relief expressly provides that they may not possess firearms. We assume Congress meant with the amendment exactly what it meant in the prior law, and the "expressly provides" language was continually strictly construed to require language on the face of the document itself concerning firearm possession.

Here the Government concedes that ¶ 1005–5–5 comprises the sum total of Illinois' restoration of civil rights, and that paragraph is silent as to firearm possession. Nothing in that section excepts from its scope firearm rights; instead one must look to ¶ 24–1.1 to find any limitation on those rights. This simply does not rise to the contemplated level of the "expressly provides" language of § 921(a)(20); to the extent ¶ 1005–5–5 restores the same "civil rights" contemplated by § 921(a)(20), we hold that ¶ 24–1.1 does not act as an express provision to that restoration.

### (D) The Meaning of "Civil Rights"

■ Were we to stop here we would have to find in Defendant's favor, because the arguments expressly raised by the Government have not persuaded us. Certain arguments made by the Government, however, have convinced the Court that Defendant's motion should be denied, but these arguments have been addressed to the wrong statutory language. In light of the fact that by virtue of ¶ 24–1.1 Illinois has forbidden Defendant to possess firearms in spite of the restoration of civil rights accorded him by ¶ 1005–5–5 (even

Defendant concedes that Illinois could have prosecuted him for possessing this handgun had it chosen to, notwithstanding ¶ 1005–5–5), we wholly agree with the Government's contention that Congress' purpose in amending § 921(a)(20) would be "turned on its head" by finding in Defendant's favor. We shall explain, by looking again to the context of the amendment in question.

Prior to enactment of § 921(a)(20), as has been detailed previously, many cases held defendants liable for violating § 922 and § 1202 in spite of the fact that the states within which their underlying convictions were entered would allow them to possess firearms. Many cases noted the potential hardship of these rulings, but the rulings stood because they were supported by the statutes' language. When Congress enacted the Firearms Owners' Protection Act it had before it those cases, and was interested primarily in alleviating the hardships caused by the predecessor wording, and particularly with those hardships created due to a misleading difference between state and federal law as to the effect of a pardon, expungement, setting aside or restoration of rights. These were the most egregious hardships, created when defendants relied upon their states' assurances that they could possess weapons, only to find themselves hauled before a federal court on federal charges; these were the cases targeted by Congress in amending § 921(a)(20). Hence, Congress' intent was only to benefit those defendants who had been restored to the right to possess guns by the relevant state.

Section 921(a)(20) requires that "[w]hat constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held," but when Congress declared that a conviction is not a conviction if civil rights have been restored, the meaning of "civil rights" must be determined according to federal law. Whatever else Congress may have meant by "civil rights," it is clear it meant the right to possess firearms. Indeed, any other conclusion would lead to absurd results. The

**1298**

federal firearm laws are meant to protect society from undesirables who would misuse guns; from experience Congress learned that the original Act was too broad, and so it narrowed its scope while retaining its purpose. The class of persons federally disqualified was intentionally narrowed to include only those also disqualified by the states, and hence § 921(a)(20) sought to exclude from federal reach only those excluded from the states' reach. To adopt Defendant's position here would be to totally disregard that obvious legislative intent, and instead to find that Defendant is free to carry firearms as far as the United States is concerned even though the state which made his federal relief possible could itself punish him for possessing guns. We choose not to construe this statute in such a manner as to reach an absurd result, and so, as earlier suggested, we hold that the words "or has had civil rights restored" in § 921(a)(20) requires, at the least, that the Defendant be restored by the relevant state to the right to possess firearms.

To be sure, a restoration of civil rights may well encompass more than the right to possess firearms. This would add meaning to the "expressly provides" portion of § 921(a)(20), because if all "civil rights" meant was the right to possess firearms then there would be no need for the "expressly provides" language. Instead, it seems reasonably clear that "restoration of civil rights" contemplates whatever amount of restoration a state may choose to grant, so long as it at least includes the restoration of the right to possess firearms.

As further support for this view of § 921(a)(20), we would note that the amendments to that section made by the Firearms Owners' Protection Act essentially codified the holding of the *Matassini* case, 565 F.2d 1297. It will be recalled that *Matassini* took a generally unfavored view—that a state pardon could preclude prosecution under both § 1202 and § 922 even though the pardon did not expressly mention firearms if the effect of the pardon was to renew the state-created right to possess guns. Unlike almost every other court construing those sections—including the Supreme Court—*Matassini* found "no reason, in ei-ther the language or legislative history of [the Omnibus Act] to doubt that Congress adopted the states' own definitions of conviction, including the effects of a pardon thereon." *Matassini*, 565 F.2d at 1309–10 n. 26. The precise effect of the amendments at question here was to legislate the *Matassini* result, and since the key to that result was the state's determination of the lawfulness of firearm possession, the interpretation of the amended § 921(a)(20) we reach is in conformance with that overall legislative scheme.

■ Defendant might still have eluded this federal net had he convinced this Court that his restoration of civil rights under ¶ 1005-5-5 was absolute, and that no Illinois court would convict him of violating ¶ 24-1.1 due to ¶ 1005-5-5. Unfortunately for Defendant, though, he has conceded that "[s]tate law enforcement authorities could have prosecuted James Erwin under this section but they did not," and that "[i]n any event, firearm possession in Illinois is not a 'civil right.' It is a privilege...." *Memorandum of Law in Support of Defendant's Amended Motion for a Judgment of Acquittal and Motion to Preclude Enhancement of Penalty* at 9. But no matter the concession—the Court itself has researched Illinois law on the subject, and we are convinced that Defendant's conclusions are correct.

The question presented is whether an Illinois court, faced with the apparent conflict between ¶ 24-1.1 and ¶ 1005-5-5, would rule that the latter controls the former and hence that no Illinois conviction for possession of a firearm by a convicted felon can stand due to the restoration of civil rights. No Illinois case has been unearthed which directly addresses this question, but we are confident that the Illinois courts would find that the provisions are not mutually exclusive, but rather can be reconciled.

We start, as always, with the statutory language itself. Paragraph 1005-5-5 provides first that "[c]onviction and disposition shall not entail the loss by the defendant of any civil rights, except under this Section,"

and under two sections of The Election Code. The other "civil rights" which a convict might lose by virtue of the section include the eligibility to hold any constitutional office until completion of sentence and the eligibility to vote until release from prison. Further, subsection (d) provides that "all license rights and privileges" granted by the state shall be restored upon completion of sentence unless the licensing body investigates, holds hearings and determines that restoration would not be in the public's best interest; the subsection, however, does not apply to "suspension or revocation of a license to operate a motor vehicle...."

These, then, appear to be "civil rights" as contemplated by the statute—the eligibility to hold public office and the right to vote. License rights and privileges appear dichotomized from "civil rights," and this accords with the normal sense of the respective phrases. The question thus is whether the right to possess firearms, restricted by ¶ 24–1.1, is a "civil right" like the right to hold elected office or to vote, and we have to agree with the Government that based solely upon ¶ 1005–5–5, "civil rights" contemplate matters more in the nature of political rights than what are commonly considered "civil rights." Hence, based upon the wording of the statute alone, an Illinois court would likely conclude that ¶ 1005–5–5 in no way restricts the operation of ¶ 24–1.1.

This view is bolstered by the court's likely application of the rule that "when two acts relating to the same subject matter are passed by the same legislature, ... it is the duty of the courts to construe them so that they stand together, if they are capable of being so construed." *Rawlings v. Illinois Department of Law Enforcement,* 73 Ill.App.3d 267, 277, 29 Ill.Dec. 333, 341, 391 N.E.2d 758, 765 (3d Dist.1979). More importantly, the court would doubtless apply the rule that a more specific statutory provision will usually limit the more general provision, *id.* at 278, 29 Ill.Dec. at 341, 391 N.E.2d at 765, and in this case that would clearly require that ¶ 24–1.1, with specific restrictive language, would limit the scope of the broadly-worded

¶ 1005–5–5, rather than vice versa. This would easily be accomplished by reading ¶ 1005–5–5 to refer only to political types of civil rights, and not to any right to possess a weapon.

It might be wondered whether the right to possess firearms is a civil right in the first place—if not, ¶ 24–1.1 would clearly be free from ¶ 1005–5–5's constraints. Illinois courts have, indeed, recognized that the right to possess weapons is not a federal civil right, following *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). *See Rawlings,* 73 Ill.App.3d at 274, 29 Ill.Dec. at 339, 391 N.E.2d at 763. The Illinois Constitution of 1970, though, treats the subject more broadly than does the federal constitution. Article I, § 22, states: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." This pretty clearly indicates that, while the state may regulate possession of guns, that possession is a civil right which can only be intruded upon to the extent necessary to further a legitimate governmental interest. *See Kalodimos v. Village of Morton Grove,* 103 Ill.2d 483, 83 Ill.Dec. 308, 470 N.E.2d 266 (1984).

Final support for our prediction of an Illinois court's ruling comes from the obvious purpose of ¶ 1005–5–5. As is noted in the unofficial commentary accompanying the section, the Illinois Constitution of 1970 contains two provisions which expressly revoke certain rights upon a felony conviction. Not surprisingly, these are the right to vote (Art. XIII, § 1) and the right to hold certain offices (Art. III, § 2). In both cases the constitutional disability may end upon completion of the sentence, but only if the legislature should so provide. It is obvious that the first three subsections of ¶ 1005–5–5 are merely an attempt to relieve the constitutional disabilities, and are in no way meant to serve as a wide-ranging liberator of all statutory restrictions. Especially since the 1970 constitution also expressly allows the state to limit firearm rights in the interest of the police power should ¶ 1005–5–5 be read narrowly to include only the disabilities contemplated.

**1300**

In sum, and to reiterate, we are convinced an Illinois court would, under the present facts, find that Defendant had violated an Illinois firearm possession law notwithstanding ¶ 1005-5-5; such a court would find no conflict between ¶ 24-1.1 and ¶ 1005-5-5 because "civil rights," as used in ¶ 1005-5-5, refers only to a certain category of political rights, and has no impact on a convicted felon's right to possess weapons. We are similarly convinced that when Congress amended § 921(a)(20) to exclude from federal prosecution those whose "civil rights" have been restored, it meant, if nothing else, that the relevant state must have restored the defendant's right to possess firearms. Since Illinois has not restored that right to Defendant, his "civil rights" have not been restored within the meaning of § 921(a)(20), and so his motion for judgment of acquittal on that basis must be denied.

## IV. ENHANCED PENALTY

The Defendant has also asked that this Court deny the Government an enhanced penalty pursuant to § 924(e)(1), which provides for a minimum 15 year sentence "[i]n the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense...." Defendant argues that he is not a "convicted felon" under § 921(a)(20), and so cannot be found to have "three previous convictions" under § 924(e)(1).

Obviously, since we have held that Defendant has been convicted of a "crime punishable by imprisonment for a term exceeding one year," his argument with respect to § 924(e)(1) must fail likewise. *See also, United States v. Sherbondy,* 865 F.2d 996 (9th Cir.1988). The Government is therefore free to seek § 924's enhanced sentence.

## V. OTHER MATTERS

Defendant's *Amended Motion for Judgment of Acquittal, or in the Alternative, Motion for a New Trial* raises several other objections to his conviction, all based upon evidentiary rulings made first during the course of the trial. We have re-examined those rulings and find them to have been correctly made in the first instance. This Motion is therefore denied on these grounds as well.

*Ergo,* for the reasons set forth above, Defendant's post-trial motions, including his motion to preclude enhancement of penalty, are DENIED.